THE STATE v. JOHN MESSINO, Appellant.—30 S. W. (2d) 750.

Division Two, July 3, 1930.

744

*Jos. R. Lasson* and *Myer Goldberg* for appellant.

748

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent; *Otto & Potter* of counsel.

COOLEY, C.—Defendant, Tony Mangercino, Carl Nasello and four others were jointly charged by information, filed July 3, 1928, in the Circuit Court of Jackson County, with the crime of murder in the first degree for the killing, on June 14, 1928, of James H. Smith. Defendant having asked for a severance was tried separately, the jury finding him guilty of murder in the first degree as charged and assessing his punishment at death; From sentence and judgment in accordance with the verdict he appeals.

The evidence, briefly outlined, tends to show the following facts. On June 14, 1928, about 9:30 A. M., the Home Trust Company, a banking institution located at 1117-19 Walnut Street, Kansas City, Missouri, was robbed. For brevity we shall refer to it as the bank, as it is called in the testimony. The bandits secured about $19,000, mostly in currency, but including some Liberty bond interest-coupons. The evidence indicates that seven men participated in the robbery, among whom were defendant, Mangercino and Nasello, who were identified, and the proved circumstances demonstrate that all were acting in concert and by prearrangement.

Walnut Street runs north and south. Eleventh Street runs east and west, crossing Walnut about two hundred feet north of the bank, which is on the east side of Walnut between Eleventh and Twelfth Streets. Tenth Street also runs east and west, crossing Walnut a block north of Eleventh Street. At the time here involved, James H. Smith, known as Happy Smith, was a traffic officer stationed at the intersection of Eleventh and Walnut Streets.

The robbery of the bank occupied but a few minutes of time. No one testified to seeing the bandits arrive. The first intimation of trouble had by any one in the bank was when several of the bandits, some masked and all armed, appeared in the bank and demanded the money, which was quickly secured, and hastily left. Defendant had remained outside in a Buick automobile, which waited, headed north, near the curb in front of the bank. While defendant thus waited, sitting at the steering wheel, a man started across the street toward the bank and defendant pointed a gun at him, whereupon the man retreated. Several shots were fired in the bank, but no one was injured there. As the robbers who had entered the bank emerged therefrom, one of them was heard to ask where the car was. They all got into the Buick car, which immediately started north in Walnut Street, defendant driving. Some shots

were fired by the bandits about the time the car started and more as it proceeded northward, but it is not shown that the shots fired prior to the shooting of Smith were directed at any particular person.

Smith was evidently shot intentionally. He had been at his station at the intersection of Eleventh and Walnut Streets. He evidently heard the shooting at the bank, or was apprised of it by a man who was seen hurriedly to approach and speak to him, and started in that direction, walking rapidly or, as some witnesses said, running. He was dressed in official uniform, and one witness testified that as he started toward the bank he had his hand on his pistol which was in his belt. When he was "about the middle of the safety zone," the space along the street car track in Walnut Street immediately south of Eleventh Street where street cars stop to discharge and receive passengers, one of the bandits in the Buick car shot him with a short-barreled shotgun loaded with buck shot, and he fell, mortally wounded. He died that day. His police pistol was found on the pavement beside his body.

Immediately after Smith was shot a young woman, who was crossing Walnut Street at the intersection of Eleventh and Walnut in front of the oncoming bandit car, was shot by one of the bandits. She fell, wounded. She later recovered from the wound.

The Buick car continued rapidly northward, and as it neared Tenth Street the traffic signal at that intersection was turned against north-and-south traffic, and the occupants of the car or some of them fired a fusillade of shots at Traffic Officer Capshaw, who was stationed there. He fell, wounded. The bandit car sped on and presently was lost in the traffic by those who were trying to follow it, but a short time later a Buick car answering the description and containing seven men was seen to stop at the intersection of Eleventh and Charlotte Streets. Four of the men got out, the other three going on in the Buick. As it started on a gun was dropped from it and one of the men got out and picked it up. Of the four who left the car two entered a car which had been parked near that intersection and went in one direction, while the other two went in a different direction in another car which also had been parked nearby. It is evident that these two cars had been placed there in contemplation of dispersement of the band at that point.

Defendant did not own the Buick car, but on the evening preceding the robbery had arranged with its owner for its use and had it delivered to him on the morning of the 14th. After the robbery it was left in a garage which was rented for the purpose, where it was found shortly after defendant's arrest. It was shown that defendant had bought a lock for that garage, and when arrested early in the morning of June 15th had the keys to the garage and the Buick car. After questioning following his arrest he told one

of the officers where he and his companions had divided the stolen money and hidden their weapons, and pointed out the place. There the officers found a grim array of deadly weapons, including pistols and revolvers, a Thompson machine gun and at least one shotgun, and ammunition for the weapons. Partially burned remnants of some of the interest-coupons stolen from the bank were also found there, and were identified by the bank officials. Such further reference to the evidence as may be necessary will be made in connection with questions to which it may be pertinent.

I. Before taking up the numerous assignments of error in defendant's motion for new trial we shall consider one arising from events which occurred subsequent to the filing of that motion. The case was tried before Hon. O. A. Lucas, one of the regularly elected judges of the Circuit Court of Jackson County and then presiding in Criminal Division B of the circuit court, to which division the case had been assigned. The verdict was returned on July 22, 1928, during the May term. Motion for new trial was timely filed at that term. On September 24, 1928, at the September term, the motion was argued before Judge Lucas who took it under advisement and thereafter died without acting upon it. Hon. Charles P. Woodbury was duly appointed and commissioned as Judge Lucas's successor in office, qualifying and assuming his official duties on October 6. Thereafter, at the November term, 1928, the motion was again fully argued before the court with Judge Woodbury presiding. The hearing extended over several days and at its conclusion the court took the motion under advisement, and on January 4, 1929, overruled the motion and sentenced defendant.

Defendant earnestly contends that Judge Woodbury was incompetent to pass upon the motion for new trial except to sustain it and grant a new trial, because he had not presided at the trial and seen and heard the witnesses. At the hearing of the motion for new trial he requested the court, by oral motion, to grant a new trial "without regard to the merits of the case" and solely for the reason that Judge Lucas had died without passing upon the motion and that Judge Woodbury had not presided at the trial. The request, though oral, was treated by the court and by counsel for the State as though made by written motion and as sufficiently presenting the issue sought to be made; wherefore, especially in view of the gravity of the case, we shall so treat it. It was overruled and exceptions saved. Defendant's contention in this court is thus stated in his brief:

"It must be distinctly understood that we are not urging that a trial judge's successor has no authority or power to pass upon a motion for new trial. What we *are urging* is that a judge who did

not preside at the trial proper is not competent to pass upon the moving party's motion for new trial, other than to sustain same, because in passing upon or determing the moving party's motion for new trial it is essential, and fairness and justice dictate, that the judge must be familiar with things and matters that took place during the trial proper, that never are and never can be incorporated in the record.''

If authority of a trial judge's successor to determine a motion for new trial upon its merits may be governed by statute the question has been determined in this jurisdiction adversely to defendant, in view of the construction given Section 1463, Revised Statutes 1919, which provides that when the judge who heard the cause shall go out of office before signing the bill of exceptions, the bill, if agreed upon by the parties to be true or shown to the judge to be correct, shall be signed by the succeeding or acting judge of the court where the case was heard. This section appears in the Code of Civil Procedure, but is made applicable to criminal cases by Section 4039, Revised Statutes 1919, which provides that bills of exceptions in criminal cases shall be settled, signed, sealed and filed as allowed by law in civil actions.

Section 1463, supra, is the same as Section 2171, Revised Statutes 1889. Prior to its enactment it had been held in Woolfolk v. Tate, 25 Mo. 597, and Cocker v. Cocker, 56 Mo. 180, that an incoming judge's only course when called upon to pass upon a motion for new trial filed before his predecessor, but undisposed of, was to grant the motion. But in State ex rel. Cosgrove v. Perkins, 139 Mo. 106, 40 S. W. 650, this court, in Division Two, referred to the rule as previously announced in the Woolfolk and Cocker cases, but held that the power to sign a bill of exceptions conferred by the above section carried with it as a coincident right the right to pass upon motions for new trial, without which the power to sign a bill of exceptions would be worthless and ineffectual. The Perkins case was decided in 1897. In Fehlhauer v. City of St. Louis, 178 Mo. 635, 653, 77 S. W. 843, decided in 1903, this court in Division One approved and followed it. It was followed by the St. Louis Court of Appeals in Glaves v. Wood (1898), 78 Mo. App. 351, and by the Kansas City Court of Appeals (1904) in Bailey v. Coe, 106 Mo. App. 653, 79 S. W. 1158. It was again expressly approved by this court upon the point under discussion in Thompson v. Railroad (1916), 270 Mo. 87, 95, 192 S. W. 1034, in which case the motion for new trial, among other grounds, assailed the verdict as being against the weight of the evidence. The trial judge's successor overruled the motion and the judgment was affirmed.

It will thus be seen that both divisions of this court have construed said section of the statute as conferring power upon the succeeding judge to pass upon and determine on its merits a motion

for new trial filed before, but left undisposed of, by his predecessor who heard the case tried. That construction of the statute thus frequently announced in the decisions above mentioned must have become known to the Legislature and the statute has been continued in force without change. We must presume that the Legislature is satisfied with the statute as so construed.

But defendant contends that authority of the succeeding judge to pass upon the motion in the situation shown should be and is restricted to the right to sustain the motion and grant a new trial; that to hold that he has authority to determine the motion on its merits and to overrule it if in his judgment so advised, especially when the motion challenges the sufficiency of the evidence as in this case, amounts in effect to a denial of the right of trial by jury guaranteed by the State Constitution and to the taking of defendant's life without due process of law in violation of the State and Federal Constitutions.

In view of the importance of the question and the earnestness with which it is pressed, we have, notwithstanding our former decisions referred to, given it extended investigation and the most careful consideration.

Section 1463, supra, as we have construed it, if that construction does not make it obnoxious to our State Constitution, is not violative of the provision of the Federal Constitution invoked, viz., Section 1 of the Fourteenth Amendment. [Frank v. Mang'um, 237 U. S. 309.] Indeed, defendant concedes in his brief that "there is nothing in the Constitution of the United States which would preclude the *abolition* by a State of 'trial by jury;' " citing Frank v. Mangum, supra. (Italics ours.) So we need not further consider the alleged violation of the Federal Constitution.

Defendant cites numerous cases. Several from other jurisdictions hold that there cannot be a substitution of judges during the trial, but in those cases the facts show that the substitution occurred during the actual trial and before verdict, which, as held in Freeman v. United States, 227 Fed. 732 (Cir. Ct. of Appeals, 2d Circuit), is a different matter. The cases most relied upon are United States v. Harding et al., 1 Wall. Jr. 139 (U. S. Circuit Court), and Bass v. Swingley, 42 Kan. 729.

In United States v. Harding et al., supra, Harding had been convicted in the circuit court of murder and before his motion for new trial was acted upon the trial judge died. The motion was argued before the succeeding judges. Neither the evidence nor the trial judge's charge had been preserved so as to be available to his successors. A new trial was ordered. The court said:

"The considerations which determine the opinion of the court are altogether independent of any discussion of the reasons filed. It is enough that there is a question of merits, referring itself

to evidence that is not before us. We cannot . . . undertake the exercise of a judicial discretion, without the legal assurance of the facts by which it should be guided."

It is stated in the opinion that a defendant, before sentence can be pronounced upon him, has a right to the judicial determination of his guilt by the court as well as by the jury, and that if the verdict does not satisfy the conscience of the judge he may set it aside and grant a new trial. It does not clearly appear from the opinion, however, that the court deemed that it could not lawfully have determined the motion on its merits if the evidence and the trial judge's charge had been fully presented.

In Bass v. Swingley, supra, plaintiff recovered judgment and defendant filed motion for new trial challenging, *inter alia,* the sufficiency of the evidence. Before the motion was determined the county in which trial was had became part of another judicial district and the motion was subsequently heard and overruled by the judge of the latter district. The Supreme Court of Kansas reversed the judgment, holding in substance that it is the duty of the judge not merely to register and enforce the verdict, but intelligently to determine whether it is sustained by sufficient evidence, and that only the judge who tried the case and saw and heard the witnesses was in position to be able so to act. The court cites several early cases, among them being Woolfolk v. Tate, Cocker v. Cocker, and United States v. Harding et al., supra, and Ohms v. State, 49 Wis. 422, in which the Wisconsin court expressed similar views and reached the same conclusion in a murder case. Ohms v. State, supra, is also cited by defendant herein.

None of the cases cited discusses or seems to proceed upon the theory that the right to have the judge who presided at the trial, *and no other,* determine a motion for new trial, constitutes an essential part of "trial by jury," as that term is used in the Constitution or as it existed at common law. And we have been able to find no case so holding. Indeed, at common law it seems not to have been the practice for the trial judge to grant new trials in felony cases. In 16 Corpus Juris, section 2615, page 1117, it is said that "new trials were granted at common law in cases of misdemeanor, but not in prosecutions for felony, the practice therein being to grant a stay during which an application might be made for pardon. . . . At the present time in the United States the occasions and procedure for new trials in criminal proceedings are wholly statutory. . . ." Hubbard v. State, 72 Neb. 62, states that at common law the finding of the jury was conclusive of the fact of guilt and the court possessed no power to set aside the verdict and grant a new trial on the merits, on motion of the accused, even where the verdict was against the weight of the evidence. If the court thought the verdict wrong a stay would

be granted and the matter presented to the crown. It seems that in such case a pardon was usually, if not always, granted. See also Sanders v. State, 85 Ind. 318; State v. McCord, 8 Kan. 232; Ohms v. State, supra; 2 Tidd's Prac. p. 911; State ex rel. Sinks v. Dist. Ct. et al., 64 Mont. 181, 208 Pac. 952, holding that new trial proceedings are purely statutory and therefore the Legislature may restrict or abridge the privilege or even deny a litigant the privilege of moving for a new trial.

Defendant cites Capital Traction Co. v. Hof, 174 U. S. 1, 13. That case did not decide that the court, with a different judge presiding to whom the facts were fully presented, could not act upon a motion for new trial.

When the jury has rendered its verdict and the verdict has been received by the court and the jury discharged, the function of that body is completed. It no longer exists. Whatever is to be done thereafter is by the court. It seems to be considered generally that proceedings subsequent to the reception of the verdict are not parts of the trial. In State v. Brown, 63 Mo. 439, the defendant had been convicted of murder in the first degree. The record did not show his presence in court when his motion for new trial was passed upon and overruled. The statute then provided that no person could be tried for felony "unless he is personally present during the trial." The court held that "the motion for a new trial concedes that a trial of the issues has taken place, and proposes to do away with the trial had and have another or new trial ordered, and is not such a proceeding during the trial as is contemplated by the statute or embraced within its terms." The judgment of conviction was affirmed. See also State v. Long, 209 Mo. 366, 381, 108 S. W. 35.

In State v. Jefcoat, 20 S. C. 383, the court said:

"The right of accused to be present at every stage of his trial, is one that has long existed, and is especially guaranteed by Section 13, Article I, of the present Constitution of this State; but a motion for new trial, or in arrest of judgment, is no part of the trial. That must necessarily have terminated before such motion could be made, and we are not aware of any authority, or any reason, which establishes the right of the accused to be present at the hearing of such a motion."

The Nebraska Supreme Court in Davis v. State, 51 Neb. 301, a conviction of first degree murder, also held that the hearing and determination of a motion for new trial in defendant's absence was not a deprivation of his right to be present during the trial under constitutional and statutory provisions similar to ours. Decisions of other states construing similar statutory provisions and bills of rights are reviewed.

In Reed v. State, 147 Ind. 41, error was charged in that sentence was passed upon defendant in a room other than the usual court room. Defendant's right to a public trial under the Bill of Rights was invoked. Held, that overruling the motion for new trial and passing sentence were not parts of the trial and that the defendant's constitutional rights were not invaded. That a succeeding judge may pass sentence, see Charles v. State (Ala.), 4 Porter, 107.

Baldwin v. State, 119 Ark. 518, 529, seems to treat the trial as ended when the verdict is returned, as does Arnold v. State (Okla.), 132 Pac. 1123, 1126.

That the determination of a motion for new trial is not part of the trial and does not require defendant's presence, see also People v. Ormsby, 48 Mich. 494; Howard v. Commonwealth, 24 Ky. Law Rep. 612; State v. Sharp, 145 La. 891.

We have found no case in which the authority of the successor of the trial judge to determine on its merits a motion for new trial or to settle and sign a bill of exceptions was denied on the ground that it would be a denial or abridgment of the constitutional right to trial by jury. While there are a number of early cases denying the authority, where no statute conferred it, for reasons given in Bass v. Swingley, and United States v. Harding et al., supra, the tendency of later decisions in both federal and state jurisdictions is to recognize it, especially since stenography has come into general use as a means of preserving the evidence and incidents of the trial. As said in People v. McConnell, 155 Ill. 192, 40 N. E. 608: ''Every facility possessed by the trial judge, except that of personal recollection, is within the power of his successor in office. . . .'' Answering the argument that the succeeding judge did not see and hear the witnesses the court further said:

''It may well be that the one party or the other may lose the benefit of the superior credit, or the want of credit, of particular witnesses for or against him, by reason of the inability of the court, in passing upon the motion for new trial, to properly weigh the evidence, in view of their demeanor and appearance upon the witness stand. The intelligent and enlightened judge will know and appreciate this condition, and, as is done in appellate jurisdictions, where the same difficulty exists, will give due and proper weight to the previous findings in the cause.''

The McConnell case was mandamus to compel a succeeding judge to determine upon its merits a motion for new trial in a cause tried before his predecessor. The court expressed the opinion that ''under the modern practice in our courts the better rule, and the one sustained by perhaps the weight of more recent authority, is, that the succeeding judge, presiding in the same court, has power to decide a motion for new trial, and to grant or overrule the same,

and enter such judgment or order as shall to justice appertain.''
[Citing cases.]

The right of a succeeding judge to determine and to overrule a motion for new trial in a criminal case tried before another judge who died while the motion was pending, was expressly upheld in Meldrum v. United States, 151 Fed. 177 (Cir. Ct. of App. 9th Circuit). An act of Congress, passed in 1900, authorized such procedure if the evidence had been taken by a stenographer. Contention was made that the right of the accused ''to have the judge who presided at his trial take part with the jury at every step in the determination of his guilt or innocence was a fundamental right which could not be taken away by an act of Congress.'' The contention was denied. The court said that in United States v. Harding et al., supra, the right was denied on the ground that the evidence and instructions had not been preserved, and cited and quoted from New York Life & Fire Ins. Co. v. Wilson, 8 Pet. (U. S.) 291, 303, as sustaining its ruling.

The rule in Kansas announced in Bass v. Swingley, supra, was changed by a statute passed in 1913 providing that a motion for new trial shall not be sustained and new trial granted because a judge other than the one who tried the case is hearing the motion, if the evidence has been taken and is available for the judge hearing the motion and such judge has the facts before him.

The authority of a judge who had not presided at the trial to determine upon its merits a motion for new trial challenging the sufficiency of the evidence was upheld in Southall v. Evans, 114 Va. 461, 76 S. E. 929, Ann. Cas. 1914B, 1229, in a well reasoned opinion in which many authorities are reviewed. In the notes to that decision in Ann. Cas. 1914B, the annotator says (p. 1235) that as a general proposition the successor of the trial judge has such power when the motion was left undisposed of by the trial judge, and (p. 1237) that the rule seems to be the same in criminal cases. That the succeeding judge has authority to determine the motion for new trial upon its merits is held also in the following cases: Ketcham, Admrx. v. Hill, 42 Ind. 64; Watkins v. Paine, 57 Ga. 50; Ott v. McHenry, et al., 2 W. Va. 73; Tombstone Mill & Min. Co. v. Way Up Min. Co. (Ariz.), 25 Pac. 794; Edward v. James, 13 Tex. 52; Wilson v. Cal. Central R. Co., 94 Cal. 166, 17 L. R. A. 685; Tidal Ref. Co. v. Knox Oil Co., 116 Okla. 1, 243 Pac. 150.

While, as stated, there are some decisions to the contrary, we think the weight of authority is that where the judge who presided at the trial dies or goes out of office leaving a motion for new trial undisposed of, his successor in office, if the facts are fully presented to him, has authority to determine the motion on its merits, even where the sufficiency of the evidence is challenged, and without express statutory provision. In this State, as we have

seen, the statute impliedly confers authority. We are satisfied with the construction heretofore given the statute and we are convinced that defendant was not deprived of any constitutional right by such construction and the holding that in the circumstances shown the successor of the trial judge had authority to determine the motion for new trial.

Defendant has by leave of court added to his brief a citation to Patton v. United States, 50 U. S. Sup. Ct. Rep. 253, decided April 14, 1930, in which the United States Supreme Court holds that on certain conditions one accused of felony may waive his right to a constitutional jury of twelve and consent to a lesser number or to trial without a jury. The decision does not involve the question above discussed.

But it is urged that the remarks made by Judge Woodbury at the time of overruling the motion show that he did not acquaint himself with and consider all of the evidence. We think otherwise. He said that he had carefully studied the authorities presented in support of the motion and had spent many hours "referring to parts of the reporter's notes and parts of the transcript of the testimony." Appellant's counsel say they had had parts of the testimony transcribed and submitted to the court and that a full transcript had not been made. The hearing of the motion occurred some four months after the trial and extended over a period of several days, after which the judge took a month to consider before ruling on the motion. We may safely presume that all the facts thought to bear upon points made in the motion were fully presented and that the judge gave full consideration to all questions urged. The suggestion that he could not read the reporter's notes, therefore could gleam nothing by reference to them, is hypercritical. His action in overruling the motion shows that he considered the verdict to be sufficiently supported by the evidence. And in view of the fact that at least five unimpeached and uncontradicted witnesses identified defendant as the driver of the car from which deceased was killed, we do not see how the sufficiency of the evidence can be seriously questioned. We rule this point against defendant.

II. Defendant alleges error in the denial of his application for change of venue from Jackson County because of the alleged prejudice of the inhabitants and, also, in overruling his application for "change of venue" from all of the ten judges of the 16th Judicial Circuit. In support of the latter application defendant filed affidavit in Criminal Division A, before Judge Lyon, presiding therein, alleging that all of the judges of the circuit, naming them, were biased and prejudiced and would not afford him a fair trial. Judge Lyon thereupon

ordered the cause transferred to Criminal Division B in which Judge Lucas presided, as provided by statute. [Laws 1921, p. 220.] When the cause reached Criminal Division B defendant orally objected to the jurisdiction of the court and stated that he renewed the affidavit and motion filed before Judge Lyon. The objection and motion were overruled and exceptions saved.

Defendant could not thus disqualify all of the judges of the circuit. [State v. Wagner (Mo.), 279 S. W. 23, and cases cited.] The Wagner case involved similar facts.

The court heard evidence on the application for change of venue from the county. There had been much comment in the Kansas City newspapers concerning the robbery and the killing of Smith, some of it of a character that might have inflamed the minds of readers. Defendant introduced a number of newspaper articles and called eight witnesses, though not restricted by the court to that number. The State used ten witnesses in rebuttal of defendant's evidence. It would serve no useful purpose to set out the evidence in detail.

"It is now the well-settled rule of law in this State that the granting of a change of venue in a criminal case rests largely in the discretion of the trial court, and where the trial court has heard the evidence in favor of and against the application, and reached a conclusion adversely to granting the change, such ruling will not be disturbed by this court, and should not be unless there are circumstances of such a nature as indicate an abuse of the discretion lodged in such court." [State v. Barrington, 198 Mo. 23, 85, 95 S. W. 235.]

Not only do we find no circumstances in the record indicating an abuse of judicial discretion but we think the court's ruling sustained by the preponderance of the evidence offered. In State v. Barrington, supra, a stronger showing was made in favor of defendant's application for change of venue than was made in the instant case and it was held that there was no abuse of judicial discretion in denying the application. In that case there had been much newspaper publicity, as denunciatory of the defendant therein, as in this case. The evidence is summarized and the question thoroughly considered and authorities reviewed in the opinion. The facts are sufficiently analogous to make that cause authority for our ruling on this point. [See also State v. Rasco, 239 Mo. 535, 549-551, 144 S. W. 449; 16 C. J. secs. 307-9, pp. 205-6.]

III. Error is alleged in the denial of defendant's application for continuance. The application alleges in substance that defendant

was arrested June 15 and that an information charging first degree murder was filed against him on June 16 (this probably refers to the complaint before the magistrate, as the information in circuit court was filed July 3); that he was confined in jail continuously after his arrest and unable to confer with his counsel until June 18; that the names of only twelve or fifteen witnesses, without addresses given, were indorsed on the original information, and that four or five days before the trial a new information was filed on which were indorsed approximately fifty-six witnesses and he had had no time properly to investigate said witnesses and to make adequate preparation for his defense; that for about one week, beginning July 2, he was unable to confer with his counsel because of quarantine of the jail; that because of the excitement following the robbery and homicide his witnesses had been "more or less terrorized" and had concealed themselves and could not be located and interviewed by him or his counsel; that he was not present at the robbery and homicide, knew nothing of either and that his defense would be an alibi; that he believed if given reasonable time he could "produce a number of witnesses, viz., John Morani, James Martin, Lucy Delmas and others," who would testify that he was at his home in another part of the city when the offense was committed.

Mr. Lasson, the attorney first employed by defendant, filed a supporting affidavit from which it appears that he first had a brief interview with defendant on June 16 (evidently having been employed then or before that time), but was not permitted a full interview until June 18; that Judge Lyon had stated from the inception of the prosecution that the cause must be tried at an early date; that it had been originally set for July 9 and was continued to the 16th to allow defendant additional time because of the quarantine; that he had had but fourteen days of the time since defendant's arrest in which to make preparation for the defense "and though affiant has applied himself diligently in the preparation of said cause, ample and adequate time being lacking, affiant was prevented from doing so."

Another of defendant's counsel, Hon. Thos. W. Hardwick of Atlanta, Georgia, filed supporting affidavit showing that he was employed June 22 (the day of the preliminary examination) and left after that hearing to fill other engagements outside of this State, planning to return as soon as possible to assist in preparing for the trial, then set for July 9; that on June 29, learning of the quarantine and realizing that he would not be able to confer with his client while it continued he delayed his return until July 9 when he was notified by the prosecuting attorney, as had been arranged, that the case would be called for trial July 16, and at once returned to Kansas City, arriving on the 10th and conferring

with his client on the 11th, since which time he had been "trying to aid his client in preparing the case for trial;" and that under the circumstances he had not had adequate and reasonable opportunity to prepare the cause for trial.

It further appeared from admissions of counsel that a copy of the information with the names and addresses of the additional witnesses indorsed thereon referred to in defendant's affidavit, was served on defendant July 3, the original being on file in the clerk's office, but Mr. Lasson did not get that copy until the 9th. Whether he knew before that of its filing or why his client did not send him word of the receipt of the copy does not appear. Neither the affidavit nor statements of counsel indicated what efforts, if any, had been made to investigate concerning the State's witnesses or that any effort was made to locate or secure the attendance of witnesses desired by defendant. Being incarcerated on a non-bailable charge, longer time could have availed nothing so far as personal investigation by defendant was concerned. That investigation, both as to the State's witnesses and his own, must of necessity have been made by his counsel. Since his intended defense, as stated in his affidavit, was an alibi, he must have known and presumably communicated to his counsel the names of the witnesses by whom he expected to support that defense. There was approximately a month in which counsel could have been engaged in making all needful investigations and preparations for the trial, and during all but one week of that time counsel had opportunity to interview their client if they so desired. No subpoenas for witnesses were shown to have been ordered on behalf of defendant. He neither called witnesses nor testified himself at the trial. Aside from locating and making investigation concerning witnesses, above referred to, the affidavits did not inform the court what preparations for trial counsel lacked time to make. The affidavits merely state, in the nature of a conclusion, that sufficient time had not been allowed.

Defendant cites State v. Wade, 307 Mo. 29, 270 S. W. 298, and State v. Inks, 135 Mo. 678, 37 S. W. 942. Neither sustains him. In the former an application for continuance based on the absence of material witnesses was denied and it was held error. But the affidavit showed with particularity that subpoenas had been timely issued and all possible diligence used to procure the attendance of the absent witnesses, facts not shown in this case. In the Inks case the defendant was indicted on August 27 for murder, arraigned on August 29, and the cause set down for October 28, on which latter date counsel were appointed to defend him. Application for a continuance was made on October 29 alleging, among other grounds, lack of time for preparation. The application was overruled and a jury was ordered for November 4, on which date

the trial began. Defendant was convicted of murder in the first degree and the judgment was affirmed. While counsel who were appointed on October 28 had appeared for defendant at his arraignment on August 29, they were evidently not then employed and presumably made no preparation for trial until appointed, after which they had but a week in which to prepare. We cannot see how that case aids defendant here.

In State v. Weber (Mo.), 188 S. W. 122, three weeks was held sufficient time in which to prepare for trial on charge of murder in the first degree. See also State v. Mitchell (Mo.), 204 S. W. 801; State v. Burgess (Mo.), 193 S. W. 821. The granting of a continuance rests largely in the discretion of the trial court and only an abuse of that discretion will justify interference by this court. [State v. Temple, 194 Mo. 237, 250, 92 S. W. 869; State v. Wade, supra.] There was no error in overruling the application for continuance.

IV. It is urged that the verdict is against the law and the evidence and that an acquittal should have been directed or a new trial granted because defendant was charged with and convicted of murder in the first degree and the evidence tended to prove the commission of a homicide "after the perpetration of a robbery, but in no wise connected therewith," and that there was no evidence of a conspiracy to kill the deceased.

Murder committed in the perpetration of a robbery is by statute, Section 3230, Revised Statutes 1919, murder in the first degree. Proof that the killing so occurred may be made under an information charging murder in the usual form; nor need the conspiracy, if there was one, be charged. [State v. Nasello, *ante*, page 442, 30 S. W. (2d) 132, concurrently decided, and cases cited.] As we shall have further occasion to refer to the Nasello case, we state here that it is a companion case to this, Nasello, Messino and others having been charged jointly with the same offense. The two above named and another were tried separately and the cases are here on separate appeals.

(a) Defendant's contention that the homicide was not committed in the perpetration of the robbery cannot be sustained. It is true that before the killing there had been sufficient asportation of the stolen money to complete the crime of robbery in the sense that prosecution therefor could have been maintained. But the carrying away contemplated by the robbers and constituting part of the robbery as planned had not been completed. They were still together, in possession of the stolen property and attempting to complete their dominion over it. They were in such juxtaposition to the actual robbery as that their acts at the time of

the homicide should be considered done in the perpetration of the robbery—a part of the *res gestae* thereof. [Christian v. State, 71 Tex. Cr. Rep. 567, 161 S. W. 101.] In a similar case where the same contention was made, the Oregon Supreme Court in State v. Brown, 7 Ore. 186, said:

"The act of taking and carrying away . . . commenced when the seizure was made . . . and continued until they (the robbers) had *unmolested dominion* over the property which they had taken. When they first acquired that control the robbery ended, and not before." [p. 209.]

The same question arose and was given thorough consideration in Conrad v. State, 75 Ohio St. 52, 78 N. E. 957, 6 L. R. A. (N. S.) 1154, 8 Ann. Cas. 966. The court pointed out the distinction between the definition of a crime and a statement of the circumstances which may have occurred "in the perpetration of the crime," showing that while the former is invariable the latter may vary with each case. Numerous authorities were reviewed and the conclusion reached that by the great weight of authority "where the homicide is committed within the *res gestae* of the felony charged, it is committed in the perpetration of, or attempt to perpetrate, the felony within the meaning of the statute" (quoting from Bissot v. State, 53 Ind. 408), and that such was the proper construction of the Ohio statute. The Ohio statute involved was similar to our present statute. In our opinion the killing of Smith in the circumstances shown was done in the perpetration of the robbery, within the meaning of Section 3230, supra. This conclusion finds further support in State v. Turco, 99 N. J. L. 96, 122 Atl. 844; State v. Williams, 28 Nev. 395, 82 Pac. 353; People v. Giro, 197 N. Y. 152, 90 N. E. 432; People v. Dowell (Cal.), 266 Pac. 807; Commonwealth v. Heinlein (Mass.), 152 N. E. 380. See also State v. Robinett (Mo.), 279 S. W. 696; State v. Vaughan, 200 Mo. 1, 98 S. W. 2.

(b) Neither do we agree with defendant's contention that there was no evidence of a conspiracy to kill. The facts shown indicate clearly that the escape as well as the actual robbery had been carefully planned and that the plan contemplated that the conspirators remain and act together until they had overcome or evaded pursuit and reached the point where cars had been placed so that they could there separate and continue their flight in three groups instead of one. In addition to pistols and revolvers, a machine gun and at least one shotgun, with buckshot-loaded shells, had been provided. Why the machine gun and shotgun if not for use in shooting their way to freedom? Smith, when shot, was evidently in front of and approaching them, a menace to their escape. He was killed. Capshaw, the traffic officer at the next street intersection, had the traffic signal turned against north-

bound traffic and might have interfered. He was shot. The robbers separated at Eleventh and Charlotte streets and later met at the vacant house later pointed out to the police by defendant, where they divided their plunder and left their arsenal. Their whole conduct throughout indicates prearranged and concerted action not only in the actual robbery but in the escape as well, and that human life was not to be permitted to stand in the way of their escape. The fact that the conspirators may not have planned specifically to kill Smith can make no difference. If the plan was to kill, if deemed necessary to effect the robbery and their escape, any one who might obstruct such purpose, without knowing in advance who such person might be or whether any one would do so, and Smith was killed in the execution of that purpose, then it may be said that there was a conspiracy to kill Smith. And we think the evidence clearly justified a finding that there was such pre-arranged plan.

. V. Instruction No. 2, the main instruction for the State, is assailed on several grounds. It was as follows:

"The court instructs the jury that when two or more persons enter into an unlawful agreement, or understanding, whether such agreement or understanding be tacit or expressed, to aid and assist each other in the commission of a crime, or series of criminal acts, where the crime or crimes contemplated are such that in the prosecution thereof the natural and probable consequences are that human life will be put in jeopardy, and if in the carrying out of such unlawful design a human life is taken by any one of the conspirators, each of the others is equally responsible for such killing, even though, at the time such understanding and agreement was entered into, such killing was not intended or within the contemplation of the parties as a part of the original design.

"In this connection you are instructed that if you believe and find from the evidence in this case there existed an agreement or understanding between the defendants, John Messino, Tony Mangercino, Carl Nasello, and others, or any one of them, to aid and assist each other in the commission of the crime mentioned in the information, and in the evidence (if you find from the evidence that said crime was committed), and further find from the evidence in this case, beyond a reasonable doubt, that while in pursuance and execution of said common purpose (if you find there was a common purpose), that the said John Messino, Tony Mangercino, Carl Nasello, or any one of the others engaged in the pursuance and execution of such common purpose (if you find there was a common purpose), at the County of Jackson and State of Missouri, aforesaid, on June 15, 1928, did feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, if so, shoot with a shotgun, or

pistol and by such shooting killed James H. Smith, or was then and there present, aiding abetting or assisting or was present for the purpose of aiding or assisting others, or another, in the commission of such crime, then you will find John Messino guilty of murder in the first degree, and assess his punishment, as directed in instruction number 4, and unless you so find, you will acquit the defendant.''

It is claimed: (1) That the language, ''John Messino, Tony Mangercino, Carl Nasello, and others, or any one of them . . .,'' is misleading and ambiguous and would preclude the jury from finding defendant not guilty although he may have  been found not to have been one of the conspirators. The instruction was doubtless intended to state and should have been so worded as clearly to state that if defendant Messino on the one hand, and Mangercino, Nasello and others or any of them on the other hand, etc. The phrase, ''or any one of them,'' to have any meaning, must refer to ''others.'' As written, the instruction says that if there was an agreement between Messino, Mangercino and Nasello on the one hand, and others or any of the others on the other hand, to aid and assist each other, etc., thus requiring the jury to find that Messino, Mangercino and Nasello were all parties to an agreement with one or more others. That was simply putting a greater burden on the State than the law required it to carry and could not have prejudiced defendant. Whether read alone or, as it should be, in connection with the other instructions, the jury could not have understood that defendant might be held responsible for the acts of others who may have conspired among themselves if he was not a party to the conspiracy.

(2) That there was no evidence ''supporting the issues submitted to-wit: . . . whether defendant had conspired or killed in an attempt to perpetrate a robbery.'' What we have said above disposes of this objection. The evidence was ample.

(3) That there was no evidence of an attempt to *rob deceased*, hence the jury should have been required to find the elements of deliberation, premeditation and malice. We think it too plain and well settled to require argument or citation of authorities that the statute does not require that, in order to constitute a murder committed in the perpetration of robbery murder in the first degree, the person killed must be the person robbed.

(4) That it did not define ''robbery in the first degree'' nor ''conspiracy.'' The term robbery is not defined, but we cannot conceive of any one with intelligence enough to be on a jury needing to be told that the acts done at the bank constituted robbery. The word ''conspiracy'' was not

defined, but the jury was required to find the facts that constituted conspiracy.

(5) As best we can gather from the assignments and argument in defendant's brief, which is not clear on the point, the further contention is made that the instruction was erroneous, whether read alone or with the other instructions, because: It refers to the crime. "mentioned in the information and in the evidence;" that the only crime mentioned in the information was the murder of Smith and there was no evidence to justify submission of conspiracy to commit that crime; and that the crime mentioned in the evidence is not specified, thus leaving the jury to speculate as to what crime was meant.

The robbery is not specifically mentioned in that instruction nor is it referred to therein unless the language "the crime mentioned . . . in the evidence," refers to it. But it is referred to in Instruction No. 1, wherein the court defined murder in the first degree as "the wilful, felonious, deliberate, premeditated killing of a human being, with malice aforethought, or any homicide in the perpetration or attempt to perpetrate any robbery." Defendant does not challenge instruction No. 1. Literally construed the part of Instruction No. 2 quoted refers to the murder, as that is the only crime mentioned in both the information and the evidence. Thus construed, the instruction was not erroneous for, as has been shown, there was ample evidence of conspiracy to commit that crime. If that part of the instruction was intended and understood to refer to a crime other than the killing of Smith, such other crime could only have been understood to be the robbery. That crime was emphasized throughout the trial, it was clearly and distinctly proved, and the record of the trial indicates that both sides were proceeding on the hypothesis that the State was trying to prove a homicide committed in the perpetration of robbery, while defendant was contending that the killing was not done in the perpetration of the robbery. The only objection made to the instruction when given was that it did not inform the jury that if the "act done by one of said conspirators was not the ordinary and probable effect of the wrongful act specifically agreed upon," but was a fresh and independent project of the mind of one of the conspirators, foreign to the common design, then it was the act of the perpetrator only, and further, that the converse of the instruction was not given. The suggestion that the jury may have understood the words "crime mentioned . . . in the evidence" to refer to other unlawful acts not specified appears for the first time in the briefs of counsel in this court and even there counsel do not inform us what other "unlawful acts" the jury might have thought were referred to.

The evidence reveals other unlawful acts, such as promiscuous shooting in the streets and the wounding of other persons after Smith. was shot, but these were shown as incidents of the robbery and escape, parts of the *res gestae* of the robbery and murder. We are well satisfied that the jury did not and could not have understood that part of the instruction to refer to any crime other than the murder charged or the robbery, and in either event it correctly stated the law.

Instruction No. 2, except for difference in names, is in this respect, substantially a replica of one that was held sufficient in State v. Leon Williams (Mo.), 274 S. W. 427, a case in which Williams and three others were charged with murder and the evidence showed a killing done in the perpetration of a robbery. State v. Baker (Mo.), 278 S. W. 987, was a companion case of the Williams case, Williams, Baker and two others having been jointly indicted. Baker himself had not killed the deceased. Upon his trial the instruction referred to, which had been given in the Williams trial, was given. The argument now made here that it was vague and misleading, leaving the jury to guess at what crime was intended to be referred to, was advanced, but this court held that the instruction correctly declared the law. The instruction, while not a model of clarity, could not have been misleading and sufficiently submitted the issue embraced.

VI. It is contended that an instruction submitting murder in the second degree should have been given. The undisputed evidence showed that the offense was murder committed in the perpetration of a robbery which, under the statute, was murder in the first degree, and further, that it was committed pursuant to a conspiracy to kill if thought necessary to effect escape. There was no evidence in the case requiring submission of murder in the second degree. [State v. Hopper, 71 Mo. 425; State v. Merrill (Mo.), 263 S. W. 118, and cases cited; State v. Lewis, 273 Mo. 518, 201 S. W. 80.] See also State v. Nasello, supra.

VII. Defendant also challenges instructions numbered 4, 5 and 7, which are the same as Nos. 10, 6 and 4, respectively, in the Nasello case. They submit that if defendant alone or knowingly acting in concert with another or others, wilfully, deliberately, premeditatedly, etc., shot and killed Smith he is guilty. Defendant contends that there was no evidence that defendant alone killed Smith. As in the Nasello case the evidence does not show with certainty which of the occupants of the bandit car fired the fatal shot, but it does show that one of them did.

While most of the evidence tends to show that it was not this defendant there is some testimony from which it could be found that he may have done so. It was testified by one witness that he had a weapon, described as a long barreled pistol or short shotgun, in his hand while waiting in front of the bank, and other evidence showed that until the car approached the place where Smith was killed he seemed to be steering it with one hand. Whether he fired the shot himself or was at the time knowingly acting in concert with the one who did so, he would be equally guilty. See State v. Nasello where this objection is further discussed. There was no prejudicial error in those instructions.

VIII. Error is charged in that the court refused to give certain instructions requested as the converse of the State's "main instructions." In State's Instruction No. 2 the jury were specifically told that unless they found the facts as therein hypothecated they should acquit defendant. Another instruction was in effect the converse of instructions numbered 4, 5 and 7. It is unnecessary to give converse instructions for defendant where the converse of the State's main instructions is clearly submitted either in such main instructions or in other instructions given for the State. [State v. Dougherty, 287 Mo. 82, 90, 228 S. W. 786; State v. Gurnee (Mo.), 274 S. W. 58; State v. Sloan (Mo.), 274 S. W. 734, 738, holding that the concluding words "and unless you so find the facts to be you will acquit the defendant" sufficiently submitted the converse of the State's main instruction.] Moreover, in our opinion the refused converse instructions did not correctly state the law applicable to the facts in evidence, but we refrain from discussing them as we think the converse of the State's main instruction was sufficiently submitted.

Complaint is made of the refusal of certain other requested instructions. One would have told the jury that if they found defendant guilty of murder in the first degree, they might, in fixing the punishment, consider any extenuating fact or circumstance found from the evidence. No extenuating fact or circumstance was shown. This instruction would simply have left the jury to conjecture as to what the court meant by extenuating circumstances and was properly refused.

Another sought to tell the jury that if they should find contradictions in the evidence as to material facts then a reasonable doubt might be engendered by such conflict in the evidence. It was for the jurors to determine whether or not they entertained a reasonable doubt. The term "reasonable doubt" was sufficiently defined in an instruction given.

By other refused instructions it was sought to have the jury told, in effect, that before defendant could be found guilty on the theory of conspiracy if a fellow conspirator fired the fatal shot, the jury must find that the killing of Smith was a necessary part of the design to rob the bank and escape arrest. The killing may not have been *necessary* to accomplish the robbery and the escape. The law does not require and the court properly refused to instruct that the jury must find it to have been necessary. See State v. Vaughan, supra, l. c. 17. These instructions, if given, would have been in conflict with State's Instruction No. 2, which sufficiently submitted that issue. The court did not err in refusing the requested instructions.

IX. Error is also alleged in that the record does not affirmatively show defendant's presence in court when his motion for new trial was argued and when he was sentenced. It does not appear whether he was present or not when the motion for new trial was argued but, absent some showing that he desired to be present or was prejudiced by not being there, his presence at that time was not required. [State v. Brown, supra; State v. Long, supra; Par. I hereof.] It does, however, appear from the record that he was present when sentenced. The sentence and judgment which appears in the record shows that in granting allocution and pronouncing sentence and judgment the court spoke to the defendant personally, addressing him by name and using the pronouns "you" and "your." Affidavit for appeal, signed and sworn to by defendant in person, was filed immediately. It could not properly have been executed before the motion for new trial was overruled and judgment given. The overruling of the motion for new trial, the sentence of defendant, the filing of affidavit for appeal and granting of appeal all appear in a single record entry, indicating that these steps were taken in immediate succession. In the bill of exceptions filed by defendant it is stated that "defendant was duly sentenced by the court and remanded to the custody of the sheriff," etc. He could not have been *duly* sentenced unless present. [Secs. 4055, 4056, R. S. 1919.] It is not claimed that defendant was not in fact present—only that the record does not so show. We think the record sufficiently shows his presence.

X. It is contended that the court erred in admitting testimony of witness Myers to the effect that a revolver which he had owned passed into the possession of Nasello some six months before the robbery of the bank. Nasello was identified as one of the bandits and the revolver in question was found with the other weapons at the place pointed out to the officers by de-

fendant where the weapons had been hidden after the robbery. The reason assigned in the objection to the evidence at the trial was that it was irrelevant and did not tend to connect defendant with the crime. The only reason urged in his brief here is that it tended to show the commission of a robbery some months previously of the theater of which Mr. Myers was manager. The robbery of the theater was in no way referred to either by the witness or by counsel. There is no merit in the contention.

XI. Complaint is made of certain remarks of the prosecuting attorney in his argument. Defendant's counsel at the time objected, not on the ground that the remarks were prejudicial to defendant, but that they were an unwarranted reflection upon defendant's counsel. The court remarked that the prosecutor had not said what defendant's counsel had understood him to mean. Counsel asked that the prosecutor be reprimanded and the jury instructed not to consider the remark, which the court declined to do. Conceding that the remarks complained of were improper and should not have been made, there was nothing in the episode that could possibly have affected the result of the trial.

We have examined the record and carefully considered the numerous grounds urged for reversal of the judgment. We find no reversible error. The defendant was given a fair trial and his guilt was clearly established. The judgment must be and it is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.