STATE of Missouri,
Plaintiff-Respondent,

v.

Raymond Karl LASSEN,
Defendant-Appellant.

No. 12978.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 31, 1984.

Motion for Rehearing or Transfer
Denied Sept. 17, 1984.

Application to Transfer Denied
Nov. 20, 1984.

Louis J. Nolan, Tyrone Gaither, Gaither & Nolan, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Bruce Farmer, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

Raymond Karl Lassen, 17 years of age, stands convicted of the murder of William R. Melvin, Jr., in the commission of a robbery. Such criminal action constitutes first-degree murder, § 565.003, RSMo 1978, and defendant's punishment has been assessed at imprisonment for life. Defend-ant appeals, contending 1) that the jury was improperly selected; 2) the evidence was insufficient to support the verdict of the jury; 3) the trial court erred in failing to suppress certain items of personal property because the evidence was the product of an unlawful arrest, and 4) the trial court erred in failing to instruct the jury on the defense of duress.

■ We consider first the argument that the evidence is not sufficient to support the verdict. In determining the sufficiency of the evidence to support a finding of guilt, we do not weigh the evidence; rather, we accept as true all evidence and inferences which tend to support the verdict and disregard all evidence and inferences to the contrary. The question is whether the evidence, viewed in a light most favorable to the State, is sufficient to support the verdict. *State v. Brown,* 660 S.W.2d 694, 698–99[9, 10] (Mo. banc 1983); *State v. Story,* 646 S.W.2d 68, 72 (Mo. banc 1983).

William R. Melvin, Jr., (Melvin or the victim), was about 40 years old at the time of his death. He was a resident of Indianapolis. He was employed to "transport" (drive) specially adapted vehicles from their place of modification to the place of use. At the time he was killed, the victim was delivering a school bus to Oklahoma. The bus was a 1981 Econoline Ford truck, adapted for use as an eight-passenger school bus. The yellow paint and the black striping and lettering on the bus were characteristic of a middlewestern school bus. The bus was distinctively marked "KIAMI-CHI VO–TECH."

Melvin left home the morning of January 23, 1982. He was dressed in street clothes, an ordinary government issue fatigue jacket and black combat boots. He also carried a "standard Buck knife" in a "holder" attached to his belt. The blade of the knife had "several little chips on it where [the victim had] cut electrical wire." Melvin often picked up hitchhikers when he was delivering vehicles.

Shortly before noon on January 24, the victim's corpse was discovered lying in a

shallow creek underneath a bridge in rural Greene County. The bridge is part of an unpaved road 7 or 8 miles west of Springfield, about ½ mile north of the westbound lane of Interstate 44. There was a great deal of blood on and around the bridge. Game cards, bearing the legend "McDonald's" were also found. A sleeping bag, which the victim had when he left home, was in the creek with him. A duffel bag, in which he had packed a change of clothing, was not.

An autopsy was performed on the victim's body about 4 p.m. on January 24. The pathologist who performed the autopsy had the opinion the victim had been dead 12 to 16 hours. The principal external injuries were several lacerations about the head. The main "laceration or lacerations" was a cut 6 inches in circular length; it extended "nearly the entire transverse diameter of the throat and [went] through the upper part of the larynx." The extent and severity of this wound is demonstrated by State's Exhibits 51 and 55. These autopsy photographs permit the inference that an effort was made not only to kill but also to dismember the victim. The victim had also been beaten about the forehead. The blows to the top of the head were severe enough to produce cerebral hemorrhage, but probably were not fatal. One carotid artery and both jugular veins had been cut. The pathologist was of the opinion that Melvin had bled to death within 5 minutes. The cause of the victim's death was thus shown and the time of his death fixed between midnight and 4 a.m. on January 24.

The State, apparently convinced it would be obliged to prove its case circumstantially, traced the movements of the defendant and the victim southwesterly across Missouri and into Oklahoma along Interstate Route 44. About 5 p.m. on January 23, Melvin stopped at a service station near Pacific, in St. Louis County, to have a tire repaired. Both men were at the service station for about an hour. The operator of the service station identified Melvin's picture, and testified the defendant was with him.

Melvin and the defendant were next seen at a McDonald's restaurant in Pacific. Christine Molitor, a waitress, remembered seeing the defendant and Melvin at the "drive-through window" about 6 p.m. on January 23. Although she did not look in the bus, this witness saw only the victim and the defendant. The two men were given "game cards." This evidence placed the defendant and the victim on Interstate Route 44, about 170–180 miles northeast of Springfield shortly after 6 p.m.

The bus was next seen in Greene County. Jimmy Adams worked at a gas station located at the "intersection of I-44, PP and K Highways." That intersection is about 5½ miles west of the bridge where the body of the victim was found. Adams identified a picture of the bus Melvin was driving. Melvin bought about $20 worth of gas. Adams saw no one else on the bus at that time, about 2 a.m. on January 24. However, two hours later, "[a] younger guy, probably eighteen to twenty" with a gold earring in his left ear, drove the same bus back in the station and bought $3 worth of gas. This man, whose description matches that of the defendant, was alone.

The defendant was next seen at the Midway Restaurant near Vinita, Oklahoma, about 6:15 a.m. on January 24. An employee of a service station on the premises recalled and testified that he saw the defendant there, and upon trial identified defendant as the man he saw. A man resembling the defendant was seen at a service station at Adrian, Texas, about 50 miles west of Amarillo between noon and 3 p.m. on January 24. The defendant was finally apprehended near the Texas-New Mexico border after he had abandoned the bus and had started hitchhiking west. When he was arrested, the defendant had Melvin's duffel bag and Buck knife case in his possession. The knife itself was never found.

The defendant testified in his own behalf at the trial. As material here, defendant's testimony was that there was a second hitchhiker on the bus as he and the victim

approached Springfield. Melvin got tired and pulled the bus off the road at a "large, very large" truck stop "somewhere about fifty miles from Springfield." Melvin parked the bus; having brought a sleeping bag, he was going to get some sleep. The other hitchhiker, John, said he was also going to sleep.

The defendant went inside the truck stop about midnight, ate a sandwich and drank several cups of coffee and returned to the bus. When he stepped into the bus, John was standing at the front of the bus and Melvin was lying behind John "gagging and like bleeding out of his throat."

John had a nickel-plated pistol. John told the defendant to sit down in the front seat and shut up or he, John, would blow the defendant's head off. At gunpoint, the defendant drove the bus past Springfield, and at John's order turned off onto an unpaved road. Defendant drove to a point where there was a bridge. John opened the emergency door at the back of the bus, and defendant could tell Melvin's throat had been cut and that he had been struck on his head. John forced the defendant to drag Melvin's body out of the bus and drop it into the water. John thereafter remained on the bus until the two reached Amarillo, where he got off.

■ In this court, the defendant argues that the evidence of his guilt is wholly circumstantial, that part of the State's case is "weak" and that the evidence at most establishes defendant's presence at the scene and an opportunity to commit the crime. The cases cited are inapposite and need not be discussed nor differentiated. Perhaps, the State's proof, taken alone, is insufficient to establish the defendant's guilt, but in determining the sufficiency of the evidence to support a conviction, we consider any evidence offered by the defendant which tends to support a finding of guilt because the defendant, by putting on evidence, takes the chance of aiding the State's case. *State v. Johnson*, 447 S.W.2d 285, 287[2] (Mo.1969); *State v. Truster*, 334 S.W.2d 104, 107[2, 3] (Mo.1960); *State v.*

*McRae*, 533 S.W.2d 663, 666[2] (Mo.App. 1976).

The State's evidence was that the defendant and the victim were together on the bus at Pacific, Missouri, about 6 p.m. That evidence also readily permits the inference that no other person was on the bus at the time. The proof also permits the inference that the two men were in the vicinity of a service station 12 or 13 miles west of Springfield about 2 a.m. on January 24. There was direct evidence that the victim's death occurred about that time. Thereafter, the defendant was seen, alone, near Vinita about 6:15 a.m. by a service station attendant.

■ The defendant himself gave direct testimony concerning the manner in which the victim was slain, and described the place where his body was found with remarkable accuracy. When he was finally apprehended, defendant was in possession of a Buck knife case which was positively identified as having belonged to the victim. We do not expect a jury to know that the term "buck knife" is a proprietary name given utility knives because they are manufactured by Buck Knives, Inc., of El Cajon, California. It is, however, common knowledge that knives can be used as weapons. *State v. Baldwin*, 571 S.W.2d 236, 241–42[9] (Mo. banc 1978). The knife case taken from the defendant when he was arrested—before us as State's Exhibit 32—is clearly intended to hold a large utility knife with a blade four or more inches long. There was evidence that the blade was strong and wide enough to cut electrical wire. Certainly it could easily be inferred that the knife blade was long and strong enough to cut the victim's throat.

■ That some of the State's witnesses were less than certain is of no consequence in reviewing submissibility. The credibility and weight of the testimony were for the jury. *State v. Jackson*, 608 S.W.2d 420, 421[1] (Mo.1980); *State v. Dodson*, 490 S.W.2d 92, 95 (Mo.1973). Concerning the presence of a second hitchhiker who committed the homicide, it is sufficient to say that a jury may believe all, some or

none of the testimony of a witness when considered with the facts, circumstances and other evidence in the case. *State v. Holt,* 592 S.W.2d 759, 774 (Mo.banc 1980); *State v. Jackson,* 608 S.W.2d at 421; *State v. Wynn,* 391 S.W.2d 245, 247 (Mo.1965).

While the defendant has challenged only the sufficiency of the evidence to prove a homicide, § 565.003 denounces an unlawful killing "in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping." There must be proof of the underlying felony. In the case at hand, there was evidence from which it might have been inferred that the defendant had little or no money and needed transportation to Tulsa, where he intended to visit friends. There was evidence that the victim had borrowed cash—$150—to make the trip. There was also evidence permitting the inference that defendant knew or became aware that the victim had a considerable amount of cash. When the victim's body was found in the creek, his pockets had been emptied. When the defendant was arrested in Texas, he had some personal items which belonged to the victim, $72 in cash, and had possession and control of the bus as well. It is robbery to take personalty entrusted to an employee in possession thereof, *State v. Kimball,* 613 S.W.2d 932, 936 (Mo.App.1981), and in the circumstances proved, it could reasonably be inferred that defendant took the victim's money and personal effects at the time the victim was killed. See: *State v. Shepard,* 334 Mo. 423, 427–28, 67 S.W.2d 91, 93–94 (1933). Without going further into laborious detail, we consider the evidence sufficient to prove that defendant not only killed the victim, but that the homicide was committed in the perpetration of a robbery.

The defendant's third assignment of error is that the trial court erred in failing to exclude certain personal property taken from him when he was apprehended by a city police officer from Logan, New Mexico, and another New Mexican peace officer in Texas at the request of Texas authorities. The substance of this convoluted argument is that the defendant was arrested ¼ mile inside Texas by New Mexican officers who had neither the authority nor probable cause to arrest him.

The point has been extensively briefed, but we agree with the State that the point has been waived. Prior to trial, a suppression hearing was held and the trial court denied the motion. After the pathologist who performed the autopsy on Melvin's body had testified, the State offered the items which are now the subject of objection. The exhibits were listed and identified for defendant's counsel. Counsel did not renew his objection, but stated to the court:

> "Your Honor, the reporter has been kind enough to go over his list of the exhibits and numbers with us and we now recognize what the numbers represent. *We have no objection.*" (Emphasis ours.)

The merits of this point are governed by *State v. Yowell,* 513 S.W.2d 397 (Mo.banc 1974). There our Supreme Court held, in substance, that the applicability of the exclusionary rule is a collateral issue which should be tried independently, and that a defendant must not only file a motion to suppress, but must keep the question alive by timely objection and by preservation of the issue in his motion for new trial, except when the defendant had no reason to anticipate the evidence would be offered. Id. at 402–3[1, 2]. The substance of this ruling has been restated and approved many times. *State v. Fields,* 636 S.W.2d 76, 79 (Mo.App.1982), and cases there cited. The rule requiring a contemporaneous objection is not a mere technical rule of procedure. The reason for this rule, which has been variously stated, is that the real damage is not done until the evidence is introduced and the court's ruling on a motion to suppress is interlocutory. *State v. Howell,* 524 S.W.2d 11, 19[6] (Mo.banc 1975). By the time the evidence is offered, the testimony received may have made the evidence admissible, and in any event, the trial court should be given an opportunity to reconsider its ruling. *State v. Fields,* 636 S.W.2d at 79. We decline to rule on the point as plain error because, for several reasons, we believe the evidence was admissible. The assignment of error is without merit.

Another point advanced by the defendant is that the trial court should have given his instruction "A," which is MAI–CR2d 3.26. MAI–CR2d 3.26 tenders the defense of coercion or duress. We assume that counsel is familiar with the argument that the defense of duress ought to be available as a defense to the underlying felony in felony-murder cases even though the statute, § 562.071.2(1), RSMo 1978, provides and the case law, *State v. St. Clair*, 262 S.W.2d 25, 27 (Mo.1953), 40 A.L.R.2d 903 (1953), holds that the defense of duress is not available as a defense to any charge of murder.

 Perhaps an argument can be made that the defense of duress ought to be allowed as a defense to felony-murder when the defendant did not do the killing and joined others in their wrongdoing only to save his life or in the reasonable belief that serious bodily harm would be done to him if he did not join. Professor Perkins thought so, Perkins, Criminal Law 952 (2d ed. 1969), and the American Law Institute at one point concluded the defense should extend to all crimes. Model Penal Code § 2.09, Proposed Official Draft (1962). See also Model Penal Code, Tentative Draft No. 10, pp. 2–7 (1960). And, we suppose the current interpretation of § 565.003 adds some weight to the argument; it is the intent to commit the underlying felony, not the intent to commit the killing, which is the gravamen of the offense. *State v. Clark*, 652 S.W.2d 123, 126–27 (Mo.banc 1983). The defendant would have us hold, we take it, that because his evidence was that he was forced at gunpoint to drive the bus away from the place where Melvin was killed, he was not guilty of the underlying felony—robbery—and the jury should have been permitted to consider the defense of duress as shown by his evidence.

 The difficulty with this argument, even assuming this court had the authority to read § 562.071.2(1) out of existence and to overrule our Supreme Court, is that under our felony-murder doctrine, the underlying felony and the killing are parts of one continuous transaction and "[e]scape with the loot was within the res gestae of the robbery; indeed, it was an ingredient of the crime." *State v. Engberg*, 376 S.W.2d 150, 155[1] (Mo.1964). The act of taking and carrying away commenced when the seizure was made and continued until the perpetrators had unmolested dominion over the property which they had taken. *State v. Messino*, 325 Mo. 743, 764–65, 30 S.W.2d 750, 759[13] (1930); *State v. Harley*, 543 S.W.2d 288, 293 (Mo. App.1976). A time when the perpetrators had unmolested dominion over the property never materialized. Moreover, the property taken included not only the truck, but Melvin's money and personal possessions. Further, there is not a scintilla of evidence that the defendant was compelled to take Melvin's currency, his pocket knife or his duffel bag. The defendant would not come within an exception, even if there were one.

 As the law is, the General Assembly rejected the Institute's idea that duress should be a defense to the crime of murder. Presumably the General Assembly was aware of the state of the law when it enacted § 562.071 and we must take the enactment of that statute as a deliberate legislative choice with which a court may not interfere. Cf. *People v. Gleckler*, 82 Ill.2d 145, 44 Ill.Dec. 483, 411 N.E.2d 849, 852–54[1][2] (1980). If it be argued that § 565.003 is a non-code offense, then *State v. St. Clair*, 262 S.W.2d at 27, is controlling. Even if we had the inclination, we would have no authority to read an exception into an unambiguous statute.

 The final ground advanced by the defendant is of the familiar "error by assertion" variety. On the morning of the trial, before voir dire was commenced, 10 additional jurors were added to the panel of 50 because the court thought a panel of 50 might be a number insufficient to provide a qualified, competent and unbiased jury for a murder trial. The names of the 10 additional veniremen (7 males, 3 females) were interspersed among jurors 38 through 50 (all females) in order to obtain a more even gender balance among the members of the panel. Asserting, without in any manner demonstrating, that the trial court did not substantially comply with the requirements

of §§ 495.060, 495.070 and 495.080, which prescribe the method of jury selection applicable to Greene County, counsel easily reaches the factitious conclusion that defendant was denied trial by a jury fairly representing a cross-section of the community. We have considered this point carefully, but consider it so strained and tenuous as to be unworthy of extended discussion.

We are convinced the evidence is sufficient to satisfy the due process requirement of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *reh'g denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), that no evidence was admitted in violation of defendant's Fourth and Fifth Amendment rights, that there was no instructional error and that the jury selection process did not violate the defendant's Sixth Amendment right to trial by a jury representing a fair cross-section of the community. There is no error in any respect presented here, and the judgment is affirmed.

MAUS, P.J., and PREWITT, J., concur.