THE STATE v. FRED SHARPE, Appellant.—34 S. W. (2d) 75.

Division Two, December 20, 1930.

*Anthony P. Nugent* for appellant; *Maurice H. Dwyer* of counsel.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

WHITE, J.—In the Circuit Court of Jackson County the defendant was charged with murder in the first degree, was found guilty by a jury, and his punishment assessed at life imprisonment in the penitentiary: he appealed.

The evidence shows that in January, 1929, Mrs. Nell Finnell operated what she called a rooming house at 1116 Holmes Street, Kansas City. One of the witnesses called it an "immoral house." Other witnesses were more specific in their characterization of the place. Men passing on the street were enticed into the house by girls tapping on the windows.

The defense showed that Mrs. Finnell and some of the girls rooming at her place had been convicted of liquor charges. The place had been raided four times within the memory of policemen who testified.

One Earl Durbin, the man who was killed, had known Mrs. Finnell for many years, and had known her husband who had died.

About eight o'clock in the evening, January 5, 1929, Earl Durbin and a man named Roy Ralph Watson paid a visit to Mrs. Finnell. They were there only a few minutes, in conversation with Mrs. Finnell, mainly, she said, about her deceased husband and his former association with Durbin. In about twenty minutes they left the house and started down the street.

While they were there the defendant, Sharpe, twenty-six years of age, who introduced a record showing his service in the United States Navy and honorable discharge therefrom, was passing along the street. Someone tapped on the window, and he went in. The evidence as to subsequent events and as to the arrangement of the rooms in the house is not exactly clear. His own story was that he found three girls in the living room—not the room where Durbin and his companion were. One of the girls asked him what he wanted and he said beer. He gave one of them fifty cents for beer, which he and the girls drank. In producing the fifty cents he inadvertently flashed a twenty-dollar bill. Then he directed one of the girls to get cigarettes. He felt in his pocket for money with which to purchase cigarettes and found that his twenty-dollar bill was gone. He followed the girl who had the fifty-cent piece and was taking it into the kitchen to Mrs. Finnell. When the girl handed the money to Mrs. Finnell the latter opened a pocketbook in which she had a good many bills. It afterwards developed that the pocketbook contained several hundred dollars. In the meantime Durbin and Watson had left the house. Mrs. Finnell held the pocketbook under her arm.

The defendant snatched it and started to run. He said he first demanded a return of his twenty-dollar bill. Mrs. Finnell swore there was no preliminary conversation. She·turned upon him and saw he had a pistol pointed towards her. That did not frighten her, however, for she grabbed him by the coat, and her hold was broken loose by one of the girls named Lena Reames or Lena Rush. Defendant's explanation was that he found the revolver in the pocket book which he had snatched; that in some way it was broken and cartridges dropped out. Cartridges afterwards were found on the floor. It was the theory of the State that the defendant had a revolver of his own which he displayed at the time. Mrs. Finnell all the time was screaming, following him out on the street. Other persons in the house joined in pursuit. Durbin and Watson, who had not gone far, and others on the outside joined in the hue and cry. A noisy chase began in which a number of shots were fired. The defendant was shot in the chest. He fired several shots and one took effect in Durbin's neck, causing almost immediate death. The defendant was afterwards arrested in St. Joseph.

The evidence for the State is very meager as to what occurred between the defendant and the girls when he bought beer, though it tends to show that the defendant did not have a twenty-dollar bill in his pocketbook; that he said to some one that he had only a dollar and a half.

The defendant introduced evidence to show good character.

Of the errors assigned in the motion for new trial the only one of importance, and argued at length in the brief of appellant, was the alleged error in giving an instruction defining murder in the first degree.

After an instruction in approved form authorizing a verdict of murder in the first degree if the jury should find premeditation and deliberation in the commission of the homicide, the court, by the instruction complained of, No. 2, defined the terms used, as follows:

"It is the duty of the court to instruct you on all questions of law arising in this case, and your duty to receive such instructions as the law of the case, and to find the defendant guilty or not guilty, according to law, as declared by the court, and the evidence as you have received it under the direction of the court.

"The court therefore instructs you as follows:

"Murder in the first degree is the willful, felonious, deliberate, premeditated killing of a human being with malice aforethought, *or it is any homicide committed in the perpetration or attempt to perpetrate any robbery.*

"As used in these instructions, the word 'willful' means intentional, not accidental.

" 'Deliberately' means in a cool state of the blood; it does not mean brooded over or reflected upon for a week or a day or an hour, but it means a conscious purpose to kill formed in a cool state of the blood, and not under a violent passion aroused by some real or supposed grievance, but in the furtherance of a formed design to gratify a feeling of revenge, *or to accomplish some other unlawful act.*

" 'Premeditated' means thought of beforehand for any length of time, no matter how short the time.

" 'Malice' as used here, does not mean mere spite or ill will as generally understood but signifies an unlawful state of the mind and such state of mind as one is in who intentionally does an unlawful act without just cause or justification.

" 'Aforethought' means thought of beforehand.

" 'Feloniously' means wickedly and against the admonitions of the law, unlawfully.'' [Italics ours.]

I. It was the theory of the State that the homicide occurred in the perpetration of a robbery and therefore it was murder in the first degree without proof of deliberation. It is necessary to determine whether the evidence for the State tends to show robbery or merely larceny which is not mentioned in Section 3230, Revised Statutes 1919. In order to constitute robbery, the taking of property must be accomplished by force, or by putting in fear. [State v. Parker, 262 Mo. 1. c. 178-9; State v. Spivey, 204 S. W. 1. c. 261; 23 R. C. L. 1145.] In the Parker case it was said, 1. c. 179:

''In order to remove this chain the thief had to use sufficient force to break it loose both from prosecutor's buttonhole and from his watch; here the coins stolen were merely stealthily lifted from Buckhold's pocket where they were lying unattached to his person. Such filching of loose property from the pocket with no more force than is necessary to lift and remove the property from the pocket is not robbery, but larceny,'' citing numerous cases.

And further on the same page:

''Larceny committed by snatching or jerking the property of another person from such owner's person where such property is so attached to the person or clothing as to afford resistance, or where there is an antecedent or contemporaneous struggle over the taking of the property and asportation from the owner is accomplished by superior force, is robbery.''

In State v. Holmes, 295 S. W. 71, the subject was considered under circumstances similar to the facts in this case.

Quoting from Kelley's Criminal Law and Practice, section 630a, page 588 the court said:

''The fear must in all cases precede the taking; for, if a man privately steal money or property from the person of another, and

afterwards keep it by putting him in fear, this is no robbery, but larceny only."

In 23 Ruling Case Law, l. c. 1144, this is said:

"It is essential to constitute the offense (robbery) that the violence or intimidation shall precede or be concomitant with the taking of the property, and subsequent violence or intimidation restored to for the purpose of escaping with the property or to prevent arrest will not supply the element of force necessary to establish robbery."

The circumstances here are detailed by Mrs. Finnell, as follows:

"Q. Did anyone else come to your house while Mr. Watson and Mr. Durbin were there, any other man? A. Yes, sir.

"Q. Who? A. Mr. Fred Sharpe came through there with a girl we call Lena Reames. Lena Rush I knew her by. . . .

"Q. And when you finished your supper what did they do? A. Well, I still sat at the table, I had a cup of coffee when they left.

"Q. I mean they, what did they do? Did they leave? A. Yes, sir.

"Q. Then what did you do after they left? A. Well, we had been talking of my husband, who is dead, and I sat there thinking of him, I was in very deep thought, I wasn't thinking of anyone around me. . . . Well, I sat at the end of the table thinking with my pocketbook. . . . I didn't say what I was thinking about. I had my pocketbook underneath my arm and I was sitting at the table, I had a cup of coffee there. . . .

"Mr. Alton: Q. What did this defendant do? I will change the question.

"Mr. Aylward: Save an exception.

"Mr. Alton: Q. What did he do at that time? A. Mr. Sharpe?

"Q. Yes. A. Well, *he grabbed my pocketbook from underneath my arm*, and he was *standing behind me at the Victrola*, he had been playing it, and I turned around, he was standing by my side and I turned around and he jerked the pocketbook and I saw he had a gun pointed at me, and *he had the pocketbook* in one hand, and I jumped up and commenced screaming, and he started out the dining-room door and I grabbed him by his coat pocket and someone caught a-hold of me and jerked me loose and he ran out the door and down the street and I followed him, and two girls that were in my house joined me. . . ."

The defendant's story of how it happened differs slightly from that of Mrs. Finnell. After telling about buying the beer for the girls, sending one of them for cigarettes, missing his twenty-dollar bill, and testifying that Lena Reames was the girl who beckoned him into the place, he testified:

"A. When I followed this girl out into the kitchen when I paid the girl for the can of beer I seen her give the money to Mrs. Finnell and she put it in her pocketbook, and I followed this girl out in the

room where Nell Finnell was. My intentions were to ask Mrs. Finnell for this money.

"Q. What did you do? A. I asked her for it and she started cussing me. So I thought, well there is two men in the other room, I am by myself, I want my money. So I just grabbed her pocketbook, intending to take my money and go on out. She started screaming and I heard a commotion in the other room and I ran for the door.

"Q. And you had her pocketbook with you when you ran for the door? A. Yes, sir.

"Q. What else did you have with you that you got there in that house? A. Her gun, which was fastened on the side of her pocketbook.

"Q. What kind of a gun was it? A. It was a heavy gun but a short gun.

"Q. Pistol? A. Pistol, yes, sir, revolver. . . .

"Q. When you picked up this pocketbook with the pistol attached to it what happened? A. She started screaming.

"Q. I mean what happened to the pistol? A. Well, when she started screaming I pulled the pistol off the side of the pocketbook and it came in two in some way or another.

"Q. You mean by that the cylinder bounced open? A. Yes, sir. . . .

"Q. What happened? A. When I pulled this pistol off the side of the pocketbook the cylinder came out some way and some bullets dropped out.

"Q. How many, if you know? A. I don't know.

"Q. Then what happened? You ran for the door? A. I ran for the door and started down Holmes Street and this woman chasing me and screaming."

According to the testimony of both Mrs. Finnell and the defendant the worst construction that could be put upon the defendant's act in snatching the pocketbook was larceny. It was loosely held under the woman's arm. Nothing had to be broken, and no force had to be used except just to slip it from under the arm. The State evidently attempted to bring in the element of force by the evidence that the defendant leveled the pistol at Mrs. Finnell after he got the pocketbook. If that was intended to have any effect at all it was to prevent a recovery of the pocketbook after he already had it. Besides, it did not put Mrs. Finnell in fear. She was not scared at any time. On the contrary, she immediately grabbed the defendant by his coat and hung on to him as long as she could until Lena Reames broke her hold, as she testified.

One witness said that the girl, Lena Reames, also called Lena Rush, worked at the Finnell place. When asked the character of work she

did the witness said that she enticed men into the place. The defendant said he didn't know this girl, but she visited him at the prison and reminded him that she was a daughter of Buck Rush, a man whom he had known for years. It is probable that this girl knew more about the incident of the defendant's snatching the pocketbook than anyone excepting the Finnell woman and the defendant himself, but she was not made a witness.

II. Murder in the first degree, defined in Section 3230, Revised Statutes 1919, as distinguished from murder in the second degree is the *deliberate* and premeditated killing, or homicide in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary or mayhem. The lawmakers evidently intended to classify crimes of violence as distinguished from stealthy crimes like larceny, and to provide that homicide as an incident to the commission or the attempt to commit such a crime was murder in the first degree, although deliberation was not proved. The commission of or attempt to commit such a crime *is not* deliberation but takes the place of deliberation so as to make the incidental homicide murder in the first degree. [State v. Hayes, 262 S. W. l. c. 1037, and cases cited; State v. Robinett, 312 Mo. 635, 279 S. W. l. c. 700.] Thus if the defendant were committing or attempting to commit only larceny, or attempting to escape with his booty after the commission of larceny, it would not be murder in the first degree unless the element of deliberation is shown. This distinction is not one of construction, but is the plain letter of the statute. It would be only murder in the second degree.

In making his escape the defendant was closely pursued and fired at several times. According to his testimony he did not know that he had hit anybody; he fired several shots low and into the ground, apparently for the purpose of scaring off his pursuers. While the evidence is not clear it is inferable from his statement that he himself was hit before he fired the fatal shot. He first jumped on the running board of an automobile, but was unable to retain his hold, and finally in a sort of daze after he was shot he found himself in a taxicab or automobile with a colored physician working over him.

Watson, the only witness for the State who saw the fatal shot fired, testified:

"Q. And what direction did he take? A. He jumped from the porch kind of diagonally across the yard to Holmes Street and Earl said something, I don't remember what it was, but during the conversation, it only happened in a second, he says, 'He has killed somebody or something,' and he said, 'Let's get him,' or 'follow him,' I don't remember exactly what the words were, and so I started to run and Earl was behind me, and Sharpe, when he hit the sidewalk, turned and ran south on Holmes Street in front of the laundry.

There was a car parked there and he ran out in front of this car and that is when I caught him and he turned and swung at me with something in his hand that glistened, and I thought it was a pair of knucks, and he swung at my head and I threw my hand up to ward the blow off and he hit me across the back of the hand and he stepped back and throwed his gun up again, I still don't know it was a gun, and then he threw it at my stomach and then I knew it was a gun, and he was scared, I don't know what he said, and I jumped back and jumped on the side of the automobile and then he ran straight across the street to about the center of the street. By that time Earl had come up and I stopped Earl and I told him, 'Don't go out there, the boy is scared, he will shoot you,' and he said something, 'No, he won't' or 'He hasn't got a gun' or something, I don't know exactly what he did say, but Earl started out in the street after him. In the centre of the street Sharpe wheeled and fired one shot and the shot looked like it was low, like as though it went in the street, and then he wheeled and went south again on Holmes about the centre of the street and there was a car parked on the east side on Holmes Street, and he hesitated as though he would get in this car, and he wheeled again, Earl wasn't no further than the prosecutor is from me, and he fired point blank twice into Earl. Earl fell and I stopped to grab ahold of him and I said, 'Did he get you?' and he said, 'No.' So I helped Earl to his feet, and by that time Sharpe had turned and ran west on Twelfth Street and when I lifted Earl to his feet he started west on Twelfth Street and as we wheeled the corner of Twelfth and Holmes, as we got in front of the pool hall, I was running next to the building and Earl more towards the sidewalk, and Sharpe wheeled and fired over his shoulder and shot Earl and shot him in the neck.''

Witness then said it was the last he saw of Sharpe until he saw him in the show-up room at the jail.

The circumstances are such as to justify a finding that the homicide was deliberate, though it was a random shot over defendant's shoulder; he had already fired twice at Durbin, point blank. Yet according to Watson, Sharpe was scared and acting under intense excitement—the jury might well have found the ''cool blood'' of deliberation was lacking. It is doubtful if the jury believed the fatal shot was fired in ''cool blood.'' The instruction set out above defining deliberation, declares it means in a cool state of blood ''in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful act.'' It is an attempt to put into the definition of deliberate murder an element which is not deliberation at all. The jury should have been instructed that they could find the defendant guilty of murder in the first degree only by find-

ing deliberation, but the instructions allowed a verdict of murder in the first degree on finding facts which would make defendant guilty of murder in only the second degree, or manslaughter.

Complaint is made of failure to give instructions asked by defendant, but we find that the jury was properly instructed by instructions given on the phases covered.

A demurrer to the evidence was properly overruled, a submissible case was made out; though there was evidence from which the jury could have found the defendant not guilty.

Other alleged errors assigned will not recur on another trial.

The judgment is reversed and the cause remanded. All concur.