THE STATE v. JOE HERSHON, Appellant.—45 S. W. (2d) 60.

Division Two, January 4, 1932.

*Harry L. Jacobs* and *Isadore Rich* for appellant; *I. J. Ringolsky* and *Harry Friedberg* of counsel.

*Stratton Shartel,* Attorney-General, and *C. A. Powell,* Assistant Attorney-General, for respondent.

474

FITZSIMMONS, C.—Defendant, Joe Hershon, was charged by an information, filed by the Prosecuting Attorney of Jackson County, with murder in the first degree. Upon trial he was found guilty and the jury assessed the punishment of death. The defendant's motion for a new trial having been overruled, judgment was given in accordance with the verdict. From this judgment defendant appealed to this court.

The person killed was Charles H. Dingman, Jr., a Kansas City motorcycle patrolman, on duty with other officers in an automobile on a snowy night. He was shot December 2, 1929, and died of his wounds two days later. Defendant did not testify, nor did he produce any witnesses save his sister. Her testimony was in the nature of an alibi, but it was by no means wholly inconsistent with the presence of defendant at the time and place of the shooting of officer Dingman.

Defendant stresses the assignment of error which he has lodged against an instruction upon statements alleged to have been made by him. Therefore these statements, including a written confession of defendant to an assistant prosecuting attorney, will be narrated separately. Defendant's admissions aside for the present, the State, by direct positive testimony, established these facts:

Estel F. Cashion, owner of a drug store at the northeast corner of 25th and Brooklyn Streets, Kansas City Missouri, was in his place of business on the night of December 2, 1929. There were also in the store Mr. and Mrs. Elder, customers, and Buddy Schulte, a delivery boy. About nine or 9:30 o'clock three men, armed with revolvers and automatic pistols, entered the store, forced Cashion to lie down, the others to face the wall, and robbed the cash register of $18. Defendant was identified as the one who actually took the money and who searched Mr. and Mrs. Elder after one of his companions had done so. Mr. Cashion, Mrs. Frances O. Elder and Buddy Schulte, after midnight that night, identified at police headquarters defendant Joe Hershon, also John W. Watson, and a third man named Curtis, as the robbers. Cashion also identified a Colt's revolver of large caliber as the weapon which defendant had in his hand during the robbery.

Ollie Ollison, a colored boy, was standing at 25th and Brooklyn Streets waiting for a street car when the three robbers left Cashion's

drug store. They forced him to enter with them a Ford two-door coach standing at the curb. Defendant sat beside Ollison, menaced him with the heavy Colt's revolver, which Ollison identified in court, and robbed the boy of two dollars and a watch. In a search for more plunder, defendant jerked Ollison's coat and shirt, tearing off the buttons. The robbers put Ollison out of the car on Benton Street between 27th and 28th Streets.

Three uniformed motorcycle patrolmen of Kansas City were on a tour of duty in an automobile that night, for there was snow and the streets were slippery. They were Cole C. Coffeen, the driver, Paul Glenn and Charles Dingman. About 9:45 P. M., December 2, 1929, as the officers were driving east on 31st Street across Jackson Avenue, they observed an automobile standing on the east side of Jackson Avenue headed north. The police, intending to investigate the car, backed up and drove into Jackson Avenue. The other car, after turning its lights first off and then on, drove away, and the police, sounding their siren, went in pursuit. The police car overtook and drew alongside the other car in front of 3037 Jackson Avenue. Officer Dingman, sitting beside the driver, officer Coffeen, lowered the window and called: "Police Officers! Stop that car," in a voice "loud enough that anyone could have heard it." The cars were then rolling along at about one mile an hour. Dingman dressed in uniform, wearing his star, and police cap with its insignia, sprang from the police car and went toward the left-hand door of the other car. At the same time Coffeen, the police driver, went to the rear and to the right of the other car, in which he saw three men, one in the rear and two in front. Coffeen saw Dingman throw the rays of a flash light into the other car and reach for the door handle. At that moment two shots were fired from the pursued car toward Dingman, one from the front, the other from the rear. Coffeen then fired at the man sitting beside the driver and hit him in the left shoulder. Coffeen saw two of the three inmates escape from the car, and he pursued and exchanged shots with one of them, but failed to capture him. He returned to his own car to find that officer Dingman had been shot twice, in the abdomen and above the hip. From these wounds Dingman died two days later. The abandoned car which had rolled along Jackson Avenue until it struck a fire plug and stopped, was examined by officer Coffeen that night. The left front window and door were broken out, and there was a bullet hole in the rear window. There were buttons on the floor of the car. Ollie Ollison identified them as the buttons which defendant had torn from his shirt and coat. Officer Coffeen could not identify the defendant or the two others, Watson and Curtis, as the occupants of the car.

Shortly after the shooting, a stranger went to the door of Mrs. Alice Huselton, at 3003 Cypress Street, three streets east of Jackson

Avenue, and asked her to telephone for a taxicab. She referred him to the house of Mrs. Lottie Holladay, at 3027 Cypress Street. He went there and Mr. Holladay telephoned for a cab. The stranger waited on the porch until the cab came. The cab driver drove the stranger to 2507 Chestnut Street, Kansas City. Mrs. Huselton, Mrs. Holladay and the cab driver identified defendant in court as the stranger. Mrs. Huselton testified that defendant wore a dark cap and a brown duck or sheep-lined coat. The taxi driver stated that defendant had on such a coat and hat when he entered the cab, but that he did not wear the cap or coat when he left the cab. The driver could not tell what had become of the missing garments. Defendant had on a cap and a duck coat when he was robbing Cashion's store, but he was minus these garments when Cashion saw him at Police Headquarters later in the night.

Immediately after the shooting of officer Dingman, detectives traced ownership of the abandoned car to the Prospect Drive It Yourself Company, 3037 Prospect Avenue, Kansas City, in the business of renting Ford cars. That company rented the car in question, a Ford coach, to John W. Watson at 6:30 P. M., December 2, 1929, under a written contract of hire signed by Watson. Four officers went to 3030 Walnut Street, the address which Watson gave to the Drive It Yourself Company, and lay in wait. Max Hanna, a radio mechanic, testified at the trial that in this house at 3030 Walnut Street, he saw defendant Hershon and also Watson and Curtis, the three men accused of shooting Dingman, on the afternoon of December 2, 1929, between two and three and again between four and five o'clock, while Hanna was installing a radio which Watson had bought.

About 11:30 o'clock on the night of the shooting, Watson, a man named Hicks and defendant, Joe Hershon, entered the Walnut Street house and were arrested by the waiting officers. The three prisoners were placed in detective Haycock's five-passenger car and the four officers got in with them. Haycock drove. Defendant sat beside him, and detective Rayen, described as a small man and slightly crippled, sat on defendant's lap. Detective Sergeant Higgins and detective John Stewart, with the two other prisoners, occupied the rear seat. Stewart carried a sawed-off shotgun. Haycock drove to No. 4 Police Station at 19th and Baltimore Street and into a garage there and stopped. Detective Rayen then arose from defendant's lap, and defendant at once stepped out of the right front door of the car and started "moving fast" toward the rear of the automobile, which was also toward the door of the garage. At the same moment Stewart left the automobile by the left rear door. Some one exclaimed: "Look out, he is leaving." Stewart passed around the rear of the car, met the defendant advancing and struck the defendant on the right side of the head with the sawed-off gun, inflicting a scalp wound and

cutting or bruising his right eyelid. The officers testified at the trial that it was their intention to lock up the three prisoners at No. 4 Station and go in search of Curtis, who was alleged to be the third man in the car from which Dingman was shot. But after the affair of the shotgun, they left the prisoner Hicks at No. 4 Station, and took Watson and defendant Hershon to Police Headquarters and into the presence of Chief of Police, the Chief of Detectives, many attaches of the police department, also newspaper reporters and other citizens. The arresting officers left defendant in the office of the chief of detectives, and departed again with Watson. The latter led the officers to a house at 2507 Chestnut Street, the address to which defendant earlier in the night had the taxicab to take him from near the scene of the shooting. At that house Watson opened a drawer in which the police found two weapons, one of which was alleged to be the defendant's heavy Colt's revolver. Next Watson saw Curtis walking on a street and pointed him out to the officers. Curtis was arrested, and taken to police headquarters, and into the presence of defendant. The confiscated weapon was also taken to headquarters and shown to defendant.

Chief of Detectives Boyle testified that when defendant was taken to police headquarters and into Boyle's office by the arresting officers, Boyle observed that defendant had a scalp wound and an abrasion over his right eye. Boyle called a General Hospital doctor who treated the injuries and bandaged the head wound. Boyle also testified that defendant was not struck, nor threatened, nor was he offered any immunity after defendant came to Boyle's office up to the time that Boyle left at three A. M. Boyle returned to his office about eight A. M. At that time defendant's abrased right eye had become discolored.

Immediately after defendant and Watson were taken to the office of the chief of detectives, that official summoned George H. Charno, Assistant Prosecuting Attorney of Jackson County. Charno arrived when a physician in the public service was dressing defendant's wounds. Charno inquired of defendant how he received his injuries and defendant answered that he "got hurt in the scuffle." Charno remained at police headquarters from about ten or eleven o'clock of the night of December 2, 1929, until about nine o'clock the next morning. During that time no one did violence to the defendant, nor threatened him, nor gave him any promises of immunity. Charno busied himself in the early part of the night in talking with defendant and with Watson and Curtis about the crime of which they were accused. In the later hours, when a stenographer arrived, he reduced to the form of written confessions the statements of defendant and of Watson. He first took Watson's statement and then defendant's. When he was reducing defendant's statement to writing,

Charno, his female stenographer and defendant were alone in the private office of the chief of detectives. Before Charno started to take defendant's statement he advised defendant that he had a constitutional right to refuse to testify, and that any statement which defendant might make would be used against him at the trial of any charge which might be placed against him. When defendant's statement was completed he read it in the presence of Charno, and defendant signed his name on each page and at the bottom of the last page in the presence of Charno and of the secretary of the chief of detectives, who was also a notary public and took and certified to defendant's affidavit to the statement. Three newspaper reporters who were present when defendant was brought to police headquarters observed that his scalp was lacerated and that his right eye was swollen and red. They were about headquarters until one A. M., and they testified that defendant was not struck, nor threatened, nor promised immunity.

Before the foregoing testimony touching the treatment of defendant at police headquarters was given in the presence of the jury, the trial judge held a hearing in his chambers in the absence of the jury, for the purpose of enabling him to pass upon the admissibility of the written confession. At that hearing, Chief Boyle, Assistant Prosecutor Charno, the newspaper reporters and other witnesses testified as they later testified in court and as hereinbefore epitomized. But defendant, at the hearing in chambers, testified that it was at police headquarters, and not in the garage of No. 4 Station that Detective Stewart struck him with the shotgun. He also testified that a "room full" of police took turns in knocking him down and kicking him in the stomach, accusing him the while of many forms of banditry, besides the shooting of officer Dingman. The police, he said, used on him black jacks, guns, clubs and rubber hose. All of this, he testified, was done in the presence of Charno who spoke very rough to him. Defendant, at the private hearing also denied that he gave a statement to Assistant Prosecutor Charno and denied his signatures on the written statement. Defendant, at the request of the trial judge, then wrote his name three times on a sheet of paper. In a discussion between counsel and the trial judge at the private hearing as to the place of the injuries to defendant and the admissibility of the confession, the attorney for defendant stated that the question was as to what took place at police headquarters. At the close of the private hearing the judge indicated that he would admit the confession in evidence after its execution was established in court at the resumption of the trial, except certain parts as to which he sustained defendant's objection that their recitals were too remote. The hearing in chambers consumed the greater part of the day. The trial judge not only heard all witnesses who

were called by either side, but he required that newspaper reporters to whom some witnesses had referred be found and examined.

When the confession was formally offered in evidence on the resumption of the trial before the jury, defendant by reference renewed his objections which he had made in chambers. All of these objections were to specific paragraphs of the confession upon the ground that their allegations were too remote from the charge upon which defendant was being tried, and that allegations of these paragraphs tended to prejudice the defendant in the eyes of the jury. All of these objections to specific paragraphs were sustained except one, which was overruled. That paragraph cannot be segregated or identified in the record. And no point of this adverse ruling is made upon appeal. No objection was made to the admission of the written statement in evidence upon the ground that it was involuntary or that it was coerced. As was said before, defendant did not testify before the jury, and he did not offer before the jury any testimony to support his statements at the private hearing that he had been struck and beaten at police headquarters and that he had not signed the statement. It should be added that counsel who have appeared for defendant in this court did not represent him in the trial court.

In the written statement defendant gave his name and address, said he was 22 years of age, and stated that he had been in the General Hospital in Kansas City where he remained until October, 1929. At that time he was acquainted with a girl named Evelyn Hicks living at 2507 Chestnut Street, Kansas City. He took Watson and Curtis to visit her about the time that he left the hospital, and a week later Watson moved to the Hicks home. He denied that he had been going out on "hold-up jobs" with Watson and Curtis, but he admitted that he had been on four hold-ups with Watson alone. The statement then proceeds: "The only time I was on a job with Curtis and Watson was on Monday night, December 2, 1929. We had all three been running around together and Curtis and Watson were broke. I was living at my home and my folks were helping me out. These men kept asking me to go out on hold-ups with them. I never did like Curtis and refused to go with them until I got to talk to Watson alone."

Defendant went on to say that on the morning of December 2, 1929, he went to Watson's house, and he and Watson went shopping for a radio, which Watson wanted to buy for Evelyn Hicks. He returned to the Watson house about five P. M., ate supper "and about six o'clock we all three got in a General cab and went to 31st and Prospect where Watson went over to the Prospect Drive It Yourself Company and rented a Ford sedan. We were all unarmed at this time." After stating that they picked up "old man" Hicks, the

statement further said: "Then we came back to Hicks's house and we let Hicks out and we all went in the house and there I got my 45 Colt revolver and Watson got his 45 Colt automatic which I have hereinbefore described. Then Curtis, Watson and I drove out to Watson's house and there Watson got his 32 automatic and gave it to Curtis and then we started out to see if we could find a place to hold up. We drove around until we came to a drug store on the northeast corner of 25th and Brooklyn. Watson parked the car a little east of the drug store on 25th Street."

Defendant told the story of the hold-up, substantially as it has been narrated in the summary of the testimony of Mr. Cashion, the druggist, Mrs. Elder, the customer, and Buddy Schulte, the delivery boy. Of them Hershon said in the statement: "After this hold-up, at No. 1 Station I was identified by all these people and I recognized them as the same people I had seen in that store a short time before when we were holding up the place." He denied the incident of Ollie Ollison, the colored boy, and then told the story of the shooting of officer Dingman as follows:

"We got in the car and drove east and south. We came around by 31st and Jackson and we figured on holding up another place. We drove north on Jackson a few doors north of 31st Street. I was sitting alongside of Watson, and Curtis was in the back. We turned off the lights and started to slow up and park the car. Then Curtis said, 'There's a car coming down our way.' So Watson turned on his lights and started to drive on and then we heard a siren and pretty soon this car made us get to the curb. The next thing I knew there was a police officer standing at Watson's side and had a flash light in his face and said: 'Police Officers! come out of that car.' The next thing I knew Watson had his gun up and as the officer said this he started shooting and saying: 'Put 'em up' as he was getting out of the car. I went out of the right side of the car, and had not shot yet and the officer started chasing me and I started shooting. I fired two shots and ran east between the buildings about two blocks. I stopped at a house and asked them to call a cab and they did and the cab came and I had them drive me to the Hicks home. In about two or three minutes Watson came in and said, 'I know I killed a policeman.'

"I put two more shells in my revolver and left it at Hicks's home and Watson left his 45 automatic there. This gun was unloaded, as all the bullets had been shot. Then we went over to 26th and Prospect, taking the old man Hicks along with us and called a Yellow cab from there and drove to the corner of 30th and Walnut and started to walk up to Watson's house. As we stepped to the door of Watson's house we were surrounded by police officers and taken into custody. I did not at any time shoot at a police officer and most

assuredly I did not shoot at the police officer who came up on Watson's side of the car and flashed the light in his face. I did not have an opportunity to shoot him, because I could not get at him.''

The written statement closed with the assertion that it was made voluntarily to George H. Charno, Assistant Prosecuting Attorney, ''having been advised that this statement can be used against me.'' He declared that no promises had been made to him and he had not been threatened with bodily harm.

Other oral statements ascribed to defendant by witnesses were: At police headquarters on the night of the shooting in the presence of Watson and Curtis, defendant said to detective Haycock that he, defendant, fired three shots from his large revolver at officer Dingman. Haycock stated that on the way to headquarters from the No. 4 Station Watson and defendant Hershon accused each other of doing the shooting. Detective Sergeant Higgins testified that the two men were blaming each other while they were riding in the police car to No. 4 Station. When the two accused men reached headquarters, Watson said to the police in the presence of defendant: ''I will go out and show you where the guns are.'' He went and discovered the weapons to the police. When the weapons were brought back to headquarters, defendant picked out the Colt's revolver as his revolver and admitted that he had fired three times at officer Dingman.

Defendant's sole witness, his sister, testified that she worked in an overall factory; that she reached their home at 3018 Euclid Avenue, Kansas City, about five o'clock on the afternoon of December 2, 1929, and that defendant came home about a quarter to six. He remained at home, she testified, until 9:10 or 9:15 o'clock that night. At that time, someone honked an automobile horn. Defendant went out doors, and came back and said he was going. He told her where, but she did not remember when testifying. He left and did not return home that night. The next morning she read of his arrest.

I. Defendant assigns error in the giving of Instruction No. 5 in which the trial court undertook to state the law applicable to statements of defendant. That instruction is as follows:

''If you believe and find from the evidence that the defendant made any statements in relation to the offense charged, after such offense is alleged to have been committed, you must consider such statement or statements, if any, all together, and in the light of the circumstances under which you believe they were made if you believe they were so made and determine whether such statement or statements were voluntary or involuntary. The defendant is entitled to what he said for himself, if anything, and the State is entitled to the benefit of anything he may have said against himself in any statement or statements, if any, proved by

the State. What the defendant said against himself, if anything, the law presumes to be true, unless negatived by some other evidence in the cause, because said against himself. What the defendant said for himself, if anything, the jury are not bound to believe, because it was in a statement or statements, if any, proved by the State, but the jury may believe or disbelieve it as it is shown to be true or false by the evidence in this cause; it is for the jury to consider, under all the facts and circumstances in evidence, how much of the whole statement or statements of the defendant, if any, proved by the State, the jury, from the evidence in this case, deem worthy of belief.

"The word 'voluntary,' as used in the foregoing instruction, means spontaneously, of one's own will, without being moved, influenced or impelled by others."

Defendant urges that this instruction is erroneous because it does not direct the jury to disregard defendant's alleged statements if they were involuntary. Of the clause in the instruction that the jurors must "determine whether such statement or statements were voluntary or involuntary," defendant observes that it falls short of what it should have said. A confession is presumed to be voluntary until the contrary is shown. [State v. Patterson, 73 Mo. 695; State v. Meyers, 99 Mo. 107, 12 S. W. 516; State v. Jones, 171 Mo. 401, 71 S. W. 680, 94 Am. St. 786; State v. Woodward, 182 Mo. 391, 81 S. W. 857, 103 Am. St. 646; State v. Armstrong, 203 Mo. 554, 102 S. W. 503; State v. Meyer, 238 S. W. 457; State v. Reich, 293 Mo. 415, 239 S. W. 835; State v. Hayes, 247 S. W. 165.]

The trial court performed well and with high regard for defendant's rights the duty which belongs alone to the trial court to hear and determine, out of the presence of the jury, the preliminary question of the admissibility of the confession of defendant. [State v. Stebbins, 188 Mo. 387, 87 S. W. 460; State v. Hopkirk, 84 Mo. 284.] Defendant did not object either at this preliminary hearing or before the jury that the confession was involuntary. We repeat that he objected only to certain paragraphs of the confession upon the ground that their allegations were remote and prejudicial. The court sustained each objection but one. In addition the court of its own motion struck out certain allegations of another paragraph. It is the duty of the trial court to instruct the jury in writing, fully and correctly upon all questions of law arising in the case which are necessary for their information in giving their verdict. [Sec. 3681, R. S. 1929.] But this duty is restricted to instructions upon the law applicable to evidence presented to the jury. The court is not required, indeed it would not be permitted, to predicate instructions upon testimony given in chambers in the absence of the jury at a hearing upon a preliminary question for the guidance of the court

alone. Although defendant testified at the private hearing that he had been brutally treated at police headquarters and, in this testimony, denied that he made or signed the confession neither he nor any one else so testified before the jury. In the circumstances the confession was prima-facie voluntary. We have read the record very carefully and except for defendant's statement at the preliminary hearing in chambers there is no evidence direct or circumstantial that defendant was maltreated or abused at police headquarters. Counsel earnestly contend it might be inferred that he was struck there. But the only circumstance to support this view is that his right eyelid, which was swollen and red when he arrived at headquarters on the night of December 2, was discolored, black and blue as it is commonly said, the next morning. An inference of violence does not follow from this familiar phenomenon. On the other hand there are inferences that he was not abused at headquarters. During the night of December 2, defendant was at all times in a conspicuous position there, in the presence of newspaper reporters, citizens generally and his own companions, as well as police and other officials. When he gave his written statement he was alone with the Assistant Prosecuting Attorney and a female stenographer. A current writer on ''Remedies for the Third Degree,'' admonishes American police departments to follow the example of the English police who ''are ready to go far to avoid the third degree and have long been accustomed to build up a case from witnesses and objective facts rather than relying on what the suspect may say.'' [Zechariah Chafee, Jr., in Atlantic Monthly, vol. 148, November, 1931.] In this case the Kansas City police did that very thing. Before defendant made a written confession, he had been identified by the druggist, the customer and the delivery boy as one of the men who had held up the store. His companion, Watson, had led the police to the hiding place of the weapons, had brought about the arrest of the third man, Curtis, and himself had made a written confession. The automobile which the three men had used had been traced and identified. All of these facts defendant knew, and doubtless this knowledge prompted him to talk. And all of these facts saved the police from the temptation to abuse. It is true that detective Stewart struck and lacerated defendant with the sawed-off shotgun in the garage at No. 4 Station. But Stewart acted under circumstances which gave him reasonable cause to believe that the defendant was about to escape. Detective Sergeant Higgins was in command of the three detectives who, with Higgins, had the three prisoners in custody at the No. 4 garage. Defendant's trial counsel, at the preliminary hearing in chambers, and while cross-examining Higgins, gave Higgins credit for a record and reputation of discountenancing abuse of prisoners and of preventing it where he had authori-

ty. Defendant, in his testimony in chambers, exonerated Higgins of any part in the abuse which he said had been heaped upon him at headquarters. And the testimony of Higgins tended to show that there was reasonable cause for the belief that defendant was escaping when Stewart hit him with the gun.

In State v. Thomas, 157 S. W. 330, l. c. 338, this court said: "However, under the facts disclosed by this record, the defendant was entitled to an instruction telling the jury that unless they found that the written confession and oral admissions tending to prove defendant's guilt were voluntarily made by him they should disregard such confessions and admissions." But the facts in that case were quite different from the facts here. The defendant in the Thomas case was a colored boy, seventeen years old, charged with killing a white boy in a race feud, and it was in evidence before the jury that he had been "sweated" for twenty-four hours, that he had been beaten and told that he would be turned over to a mob unless he confessed, and that he signed the paper which was presented to him without knowing its contents. We have examined the cases which defendant has cited in support of the assignment of error in Instruction No. 5. But those cases do not turn upon instructions concerning confessions of defendants. Some of them pass upon objections, overruled by the trial courts, that the statements were inadmissible because they were obviously involuntary and had been procured by coercion. [State v. Thomas, 250 Mo. 189, 157 S. W. 330; State v. Condit, 307 Mo. 393, 270 S. W. 286; State v. Nagle, 326 Mo. 661, 32 S. W. (2d) 596; State v. Ellis, 294 Mo. 269, 242 S. W. 952.] Another rules that the second statement of an impeached witness should have been excluded. [State v. Creed, 299 Mo. 307, 252 S. W. 678.] Again it was held that testimony intended to discredit the confession of defendant should have been admitted. [State v. Powell, 258 Mo. 239, 167 S. W. 559.] We repeat that there is not in this case a question of the inadmissibility of the confession upon the ground that it was involuntary since defendant made no such objection below. In view of all the foregoing we hold that the failure of the trial court to incorporate in Instruction 5 a direction to the jury to disregard statements of the defendant if they were not voluntarily made, is not reversible error.

Defendant next charges that Instruction No. 5 is erroneous because the court incorporated in it a definition of the word "voluntary." He does not complain of the definition of it, but of the fact of definition. This would seem to be inconsistent with the prior objection that the court did not go far enough in instructing upon the voluntary or involuntary character of the statement. In State v. Thomas, 250 Mo. 189, 157 S. W. 330, defendant raised the point that the court failed to define the

word "voluntary" in an instruction. This court held that the word is so simple that a definition of it is unnecessary and that an attempt to define it would amount to an unwarranted comment upon the evidence. The ruling of this court in the Thomas case was that the failure of the court to define the word "voluntary" in an instruction did not constitute reversible error. The fact that a definition of the word was included in an instruction in this case should not be held reversible error.

Defendant further argues that Instruction No. 5 is faulty because it instructs the jury that the State is entitled to the benefit of anything and the defendant is bound by anything he may have said against himself in any statement, *that is, even in an involuntary statement.* (Italics ours.) The criticism is in the italicized clause. It is a far fetched interpretation not warranted by the language of the instruction. The court instructed the jury to "determine whether such statement or statements were voluntary or involuntary," and it defined the word "voluntary" in the instruction. In State v. Schnurr, 285 Mo. 74, 225 S. W. 678, an instruction failed to use the word "voluntary" and the court held that this omission allowed the jury to presume as true any statement of the defendant whether made voluntarily or under fear or duress. The instruction in the instant case is not subject to this criticism.

II. Defendant urges that the trial court erred in giving instruction No. 1. The first paragraph of the instruction was definitive and necessarily general in terms. It told the jury that when two or more persons enter into an unlawful agreement, tacit or expressed, to aid each other in the commission of crime, and to assist each other in effecting an escape from the authorities thereafter by resisting arrest through force or the use of firearms; that when the crime contemplated by such agreement and the intent, purpose, and means to resist arrest, constitute one general purpose, and is of such nature that the natural and probable consequences are that human life will be put in jeopardy; and when in the execution of such unlawful conspiracy, human life is taken by any one or more of such conspirators, all of the conspirators so engaged are equally responsible for such act, even though the actual act of killing be not directly traceable to him or any one of them.

The second paragraph of the instruction is as follows:

"In this connection, you are instructed that if you find and believe from the evidence in this case, that on the 2nd day of December, 1929, there existed an agreement or understanding between the defendant Joe Hershon and others, to aid and assist each other in the

commission of crime, and to aid and assist each other thereafter to escape arrest by the use of firearms; and if you further find and believe from the evidence in this case beyond a reasonable doubt that while executing a common purpose to commit crime and to resist arrest by the use of firearms (if you find that such agreement and understanding did exist between Joe Hershon and others), with information or intelligence that he and they were being approached by police officers of Kansas City, Jackson County, Missouri; and then and there believing that they were about to be placed under arrest by such officers, if you find they were police officers, and in the execution of such common agreement or understanding, on the 2nd day of December, 1929, at the County of Jackson, and State of Missouri, the defendant, Joe Hershon, or any one of his co-conspirators, aforesaid (if you find that any such conspiracy existed in fact), feloniously, willfully, deliberately, premeditatedly, and of malice aforethought, shot with gun or pistol loaded with gunpowder and balls, and by such shooting killed Charles H. Dingman, Jr., or so wounded him that in direct consequence thereof the said Charles H. Dingman, Jr., died within one year and a day thereafter, then you will find the defendant Joe Hershon guilty of murder in the first degree, and assess his punishment as directed in Instruction No. 4.''

Defendant argues that Instruction No. 1 is erroneous because it did not require the jury to find that any crime had been committed by the conspiracy, and because it did not require a finding that the shooting was the direct, natural and proximate result of the conspiracy. An instruction, identical in form, with the one given in this case, was approved by this court in State v. Williams, 309 Mo. 155, 274 S. W. 427. Of an instruction of this character the court in the Williams case (274 S. W. l. c. 435) said: ''It is not necessary for an instruction of this nature to require a finding; explicit directions in this regard appear in other instructions. This is all that is required. While it is essential to their correctness that instructions shall be clear, present a harmonious whole and be supported by the evidence, it is not necessary that each should contain a finding or declare the limit of the punishment.'' To the same effect see State v. Nassello, 325 Mo. 442, 30 S. W. (2d) 132, 137.

This court has held in cases similar in their essential facts to this one that it is not error for the trial court to fail or refuse to give an instruction on murder in the second degree. The court in this case gave three instructions on murder in the second degree. [State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750; State v. Vaughan, 203 Mo. 663, 102 S. W. 644.] The first was predicated upon ''the absence of any conspiracy as defined in the instructions,'' and the second upon the absence of deliberation. Especially the first of these

instructions on murder in the second degree gave that explicit and modifying direction which is mentioned in State v. Williams, supra.

For light upon this assignment of error and upon another to be noted, it is not amiss here to notice the views of this court expressed in two recent cases involving facts similar to the instant case. These cases are State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132, and State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750. These two cases grew out of the same crime of murder. Each defendant was convicted of murder in the first degree and his punishment was fixed at death. This court affirmed both judgments. The pertinent facts in these cases were that five or six men held up and robbed the Home Trust Company at 1117-19 Walnut Street, Kansas City. They fled in an automobile, brandishing and firing weapons as they went. At 11th and Walnut Streets, police officer Smith, who was directing traffic, was shot from the automobile in which the bank robbers were escaping. He died from his wounds. Nasello was identified as being one of the robbers in the bank and as one of the occupants of the automobile. Messino was the driver of the car. The court, in its opinion in the Nassello case (325 Mo. 442, 30 S. W. (2d) 132, 136), said:

"It is said that defendant was entitled, under the evidence, to a directed verdict of acquittal, because the State's evidence establishes, first, that defendant did not shoot and kill Smith; second, that no conspiracy between defendant and others to kill Smith was shown. According to the instructions, the trial theory of the State was that, succeeding the bank robbery, defendant and others executed an understanding or common design to shoot and kill any one appearing to be a menace to their escape. The evidence adduced adequately sustains the trial theory of the prosecution. The evidence developed an unlawful conspiracy to rob the trust company, which included the common design to escape with the loot and to shoot and kill any person appearing to interfere with their escape. Thus the homicide of Smith occurred while the conspirators were participating in the robbery of the bank (State v. Turco, 99 N. J. L. 96, 122 Atl. 844; Francis v. State, 175 N. W. 675; State v. McMahon, 145 Wash. 672, 261 Pac. 639), resulting that the instructions defendant submitted for acquittal were properly overruled. In this connection, in State v. Lewis, 273 Mo. 518, l. c. 531, 201 S. W. 80, the court say: 'We hold that all the evidence in the case, including the circumstances of the killing of Dillon, shows clearly a conspiracy to murder whenever necessary in the course of defendants' business of stealing.' "

In the Messino case the court said (325 Mo. 743, 30 S. W. (2d) 750, l. c. 759):

"Defendant's contention that the homicide was not committed in the perpetration of the robbery cannot be sustained. It is true that before the killing there had been sufficient asportation of the stolen

money to complete the crime of robbery in the sense that prosecution therefor could have been maintained. But the carrying away contemplated by the robbers and constituting part of the robbery as planned had not been completed. They were still together, in possession of the stolen property, and attempting to complete their dominion over it. They were in such juxtaposition to the actual robbery as that their acts at the time of the homicide should be considered done in the perpetration of the robbery—a part of the *res gestae* thereof. [Christian v. State, 71 Tex. Cr. Rep. 567, 161 S. W. 101.]''

In the instant case facts and circumstances sustain the inference that defendant and his companions agreed together to rob and thereafter to escape by force of arms. And even if their act in stopping their car on Jackson Avenue indicated that the three robbers believed that their original agreement had been consummated, the facts and circumstances of the chase and of its tragic ending warrant the inference that in their flight from the police they renewed their agreement to shoot their way to liberty.

The assignment of error ascribed to Instruction No. 1 is ruled against the defendant.

III. The court, in Instruction No. 9, defined murder in the first degree, murder in the second degree, willfully, premeditatedly, feloniously, malice aforethought and deliberation. The definition of deliberation is as follows: '' 'Deliberation' does not necessarily mean brooded over or reflected upon for any given length of time, but it means an intent to kill, executed by a party, not under the influence of violent passion suddenly aroused by some provocation, but in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose.''

Defendant contends that this definition of deliberation is erroneous, upon the authority of State v. Sharpe, 326 Mo. 1063, 34 S. W. (2d) 75. The objection is to the words: ''or to accomplish some other unlawful purpose.'' In the Sharpe case the criticized words were: ''or to accomplish some other unlawful act.'' Section 3982, Revised Statutes 1929, defines murder in the first degree as follows:

''Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.''

It is to be observed that in the Sharpe case the homicide charged was committed in the perpetration of larceny and not of any of the crimes mentioned in Section 3982. But a complete answer to this assignment of error is that the definition of ''deliberation,'' given

in Instruction No. 9, is incorrect, but it is harmless because it is more favorable to the defendant than the law requires. The error in the definition of "deliberation" is clearly demonstrated in the concurring opinion in this case of WHITE, P. J., the author of the opinion in the Sharpe case.

Let us add that the definition of "deliberation" which is given in Instruction No. 9 is amplified and made more favorable to defendant by Instruction No. 16, to which defendant made no objection. Instruction No. 16 is as follows:

"The court instructs the jury that the words 'deliberation' and 'premeditation' as used in these instructions mean a preconceived intention which has been dwelt upon and conceived in the mind prior to the execution of such intention. It is impossible that the act should precede the intention or be simultaneous with it, for if there be any intention at all, the will must act before the muscles can move. If therefore, the fatal stroke be the spontaneous result of a suddenly formed intention to kill, the element of deliberation is wanting and the offense is not murder in the first degree, but murder in the second degree."

IV. The learned trial judge conducted the trial with a high regard for the rights of defendant. While we have reviewed the assignments of error which defendant stresses in his briefs we have examined the others stated in the motion for a new trial. We find no reversible error in the case.

The judgment of the circuit court is affirmed, and the judgment which the law pronounces is directed to be carried into execution by the Sheriff of Jackson County, Missouri, who shall hang the defendant Joe Hershon until he is dead within the walls of the jail of Jackson County, Missouri, on Friday, January 15, 1932, between the hours of six o'clock in the forenoon and five o'clock in the afternoon of said day. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur; *White, P. J.,* in a separate opinion.

WHITE, P. J. (concurring).—I concur in the reasoning and in the conclusion reached in the majority opinion. The Attorney-General in his brief asked this court specifically to approve an instruction defining "deliberately" as given in this case, and overrule State v. Sharpe, 326 Mo. 1063, 34 S. W. (2d) 75, where such definition was held to be no definition of the word.

The Attorney-General is within his rights in criticizing the opinion in the Sharpe case, for it failed to explain specifically why the definition of "deliberately" was bound to mislead the jury. Also he had a right to contend strenuously for the approval of that particular definition, because it has received the sanction of this court several times.

Definitions of words used in statutes, pleadings, instruction and other legal documents should be precise and as exact as language can make them. A definition should define, set limits, include all essentials and exclude all foreign elements.

The first rule of construction is that words used in statutes and legal documents must be given their usual and ordinary significance. The statute defines murder in the first degree as applicable here, Section 3982, Revised Statutes 1929:

"Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."

Of course it is presumed that the use of poison and lying in wait are sufficient proof of the willful, deliberate and premeditated killing. Murder, as the term is used in that statute, means murder at common law "killing a human being with malice aforethought," and "malice" means "without justification or excuse." The definitions of murder vary, but in substance they all amount to that. So we have for murder in the first degree this usual definition:

Willful, deliberate and premeditated killing of a human being without justification or excuse. [1 Wharton on Criminal Law, 587-8.]

It will be noted that deliberation is one element in that crime. Other elements are supplied by the other words. All of them must be used in order adequately to define murder in the first degree, according to that statute. The definition of "deliberately" in this case and in the Sharpe case makes that term not only perform its own office, but supplants several of the other words used in defining murder in the first degree and goes even further and applies a motive for the crime. This is the definition (326 Mo. 1067, 34 S. W. (2d) 76):

"'Deliberately' means in a cool state of blood; it does not mean brooded over or reflected upon for a week or a day or an hour, but it means a conscious purpose to kill formed in a cool state of the blood, and not under a violent passion aroused by some real or supposed grievance, but in the furtherance of a formed design to gratify a feeling of revenge, *or to accomplish some other unlawful act.*"

"Deliberately" is an adverb as used in that instruction and in the information in this case, which charges that the defendant did

"feloniously, willfully, deliberately and premeditatedly, on purpose and with malice aforethought," etc. That definition not only qualifies or describes the formation of the criminal purpose, but also it *is* the criminal purpose. "It means a conscious purpose to kill," says the definition. It is not merely a grammatical inaccuracy: it is a logical absurdity. Nevertheless that expression is usually harmless, for the jury would naturally gather that the *cool forming* of the purpose to kill was meant. But the definition goes further. It not only covers nearly all the elements constituting murder in the first degree, but it also covers the motive for committing the crime. It is "in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful act." It implies that murder in the first degree could not be accomplished unless there was proof to establish a motive, the averment of which motive being implied in the use of the word "deliberately."

Many convictions of murder in the first degree occur where no motive whatever could be discovered. In that case a conviction would have to be reversed in the absence of a proven motive. Let us take some of the cases relied upon by the State in defense of that definition. In State v. Furgerson, 162 Mo. 677, the court said, criticizing the definition of "deliberately" as "done in a cool state of blood:" "It omits an essential element of deliberation, that is, that the homicide *must have been committed* in the furtherance of a formed desire to gratify a feeling of revenge or to accomplish some other unlawful purpose."

The same judge who approved the instruction with that definition also approved one just like it in State v. Grant, 152 Mo. 70. There we have it. It is not merely an illustration of an instance where the definition would apply. It *is* the definition, under which no homicide could be "deliberately" accomplished with the element of motive omitted. Under that definition, in order for a homicide to be deliberately accomplished it *"must have been committed* in the furtherance of a formed desire to gratify a feeling of revenge or to accomplish some other unlawful purpose." "Deliberately" must not only include the motive for the crime, but it is limited to just the motives mentioned in that definition. It must be in revenge or to accomplish some other crime. Murder in the first degree has been committed deliberately from motives of jealousy, from motives of hate engendered for other reasons than by revenge. Some years ago two Chicago youths, now serving life terms, murdered a fellow-student in order to witness the phenomenon of death. Under that definition of deliberately it would not be murder in the first degree.

Another thing, that definition makes "deliberately" or "deliberate" the peculiar property of murder, as if the word could not be

applied to any other human act. A man may kill deliberately in self-defense. It would not be murder at all. A man may deliberately eat his breakfast. Suppose we apply this definition to that function. A man eats his breakfast deliberately; that is to gratify a feeling of revenge or to accomplish some other crime (other than eating his breakfast).

But look again. Take the closing clause: "To accomplish some other unlawful act." The expression is ambiguous. Does it mean *in order to accomplish* some other crime? or does it mean *in accomplishing* some other crime. If it has the former meaning it would be wholly inappropriate and misleading in the Sharpe case. It would mean that Sharpe committed the homicide in order that he might successfully commit the larceny and that he formed the design deliberately to commit the homicide for that purpose. Whereas, the larcency had been committed, the loot abandoned and the homicide occurred in a chase by outsiders who were making attempts upon Sharpe's life. But suppose the jury understood that clause to have the latter meaning, that the killing occurred in accomplishing some other unlawful act. That would give to larceny the same significance as the other felonies mentioned in Section 3982, Revised Statutes 1929, which substitute for deliberation. That evidently is what the jury thought. No one can read the record, or even the opinion in that case, and believe the jury found that the homicide occurred in a cool state of blood. The evidence of such deliberation is so extremely weak that they must have thought him guilty of murder in the first degree because he was attempting to escape after the commission of a larceny.

The definition of deliberately in this case and in the Sharpe case is not supported by authority even in this State. It occurs nowhere as a judicial expression of the meaning of the term in this State or any other, except in the approval of this sort of an instruction. By consulting the encyclopaedias and reference books one will find that the definition is limited to Missouri and possibly one other state. [29 C. J. 1104-1105.]

The principal cases cited by the Attorney-General cite in turn State v. Ellis, 74 Mo. 1. c. 214, where "deliberately" is defined in an instruction as follows:

" 'Deliberately' means in a cool state of blood and is usually used to characterize what are ordinarily termed cold-blooded murders, such as proceed from deep malignity of heart and are prompted by motives of revenge or gain."

Notice how that definition differs from the pronouncements in the Furgerson case and the Grant case, supra. The motive of revenge is mentioned as an illustration, not as a necessary part of the definition. In the Furgerson and Grant cases where it is held that the

homicide "must have been committed . . . for revenge or to accomplish some other crime," the motive is a part of the definition.

In State v. Ward, 74 Mo. l. c. 256, occurs a definition similar to that in the Ellis case. It was so discussed in State v. Kotovsky, 74 Mo. 249.

In State v. Bobbst, 269 Mo. l. c. 225, the Court said:

"The court defined the word 'deliberately' as 'done in a cool state of the blood, and not in a sudden passion engendered by lawful or some just . . . provocation.'"

The court continued:

"Appellant contends that the above quoted portion of the definition conflicts with one given in State v. Davis, 226 Mo. 493; l. c. 515, to-wit, 'in a cool state of blood and not under violent passion suddenly aroused by some real or supposed grievance.'"

The court further said:

"We are inclined to the opinion that the instruction complained of is in better form and more accurate than the one quoted in State v. Davis, supra, and that the court did not err in giving the same."

The definition in State v. Davis, 226 Mo. 515, is given in full, and is as follows:

"'It does not mean brooded over and reflected upon for a week, or a day or an hour; but it means a conscious purpose to kill, formed in a cool state of blood and not under violent passion suddenly aroused by some real or supposed grievance.'"

The motive which in the Furgerson case and Grant case was held essential is omitted. The court probably considered the expression "it means a conscious purpose to kill, formed in a cool state of blood" as an illustration, for it is not mentioned as part of the definition. Disregarding rules of grammar it could easily have been understood as "it means the *cool forming* of a conscious purpose to kill."

The definition in the Bobbst case is approved specifically in Ex parte Burgess, 309 Mo. 404.

In State v. Liolios, 285 Mo. l. c. 21, the discussion of the meaning of "deliberately" in the Kotovsky case, 74 Mo. 249, was approved.

There are several reasons why this definition has been allowed to stand in numerous cases which have come to this court. It is in printed forms used in St. Louis and Kansas City. It is usually favorable to the defendant, and appealing defendants do not question the particularly inappropriate parts of the definition pointed out above. The language used in that definition is very appropriate in *other* instructions in some trials of murder in the first degree as part of the law of those cases. It is *not* appropriate to put nearly all the law of a case in the definition of one word as is undertaken to do here. The motive which may lead to homicide, the feeling of

revenge, or to accomplish some other crime might appropriately come into the *evidence* in explanation of the surroundings, the reason for the commission of the crime. Such evidence might throw light on why the deliberate intention to commit the crime gets into the mind of the murderer. But it is like any other incident that may throw light on that. It is no part of the definition of the quality of the mental process. "Deliberately" does not mean the surroundings and circumstances which lead to the mental act. It describes the character of that mental act; not the thing that caused it. Plainly, if the definition of deliberately, as set out in the Bobbst case, is correct, then the definition in the case of State v. Fairlamb, 121 Mo. 146, in the Grant case and the Furgerson case, supra, are wrong. For the former leaves out the very part which the latter say must be in. Being later, the ruling in the Bobbst case overruled the other two. Therefore the conclusion in the Sharpe case is correct, and the definition of "deliberate" in this case is incorrect, though harmless because favorable to the defendant.